[Cite as *State v. Harris*, 2023-Ohio-648.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29379 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 00825/4 |
| | : | |
| DEON HARRIS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 3, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

J. DAVID TURNER, Attorney for Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Deon Harris was found guilty after a jury trial of four counts of murder, four counts of aggravated burglary, four counts of felonious assault, and one count of having weapons while under disability. All but the charge of having weapons while under

disability had an attendant firearm specification. After merging multiple offenses and specifications, the trial court's judgment entry sentenced Harris to a "minimum of forty-one (41) years to a maximum of fifty-two and a half (52.5) years to life."

{¶ 2} Harris appeals from his conviction, raising four assignments of error. He claims that (1) his statutory and constitutional speedy trial rights were violated; (2) his convictions were based on insufficient evidence and were against the manifest weight of the evidence; (3) the trial court erred in admitting two video clips and overruling his motion for a mistrial; and (4) the trial court's judgment entry does not accurately reflect the aggregate sentence imposed at sentencing. For the following reasons, the trial court's judgment will be affirmed. However, the trial court is instructed to file a nunc pro tunc entry correcting its judgment entry to reflect the sentence orally imposed at sentencing.

## I. Facts and Procedural History

{¶ 3} According to the State's evidence at trial, on December 21, 2019, Harris and three accomplices – King Turner, Daylequan Arnold, and Malik Ogletree – went to an apartment on Ethel Avenue in Dayton to rob the occupants of drugs, money, and other valuables. Harris kicked in the door, and his accomplices entered. They encountered Christopher Huntley in the back bedroom and Frankie McGee in the front bedroom. Both Huntley and McGee were shot multiple times by Harris's accomplices. During the incident, Turner also shot Ogletree in the forearm and himself in the hand. Huntley called 911 and was taken to the hospital, where he died a week later; McGee was deceased when officers arrived at the apartment.

{¶ 4} The police investigation proceeded rapidly. Later that day, Dayton

detectives spoke with and arrested Ogletree, who had gone to a hospital in Springfield for treatment of his gunshot wound. In addition, Dayton detectives learned about surveillance videos from outside Huntley and McGee's apartment and found Ogletree's vehicle. Within days, the police had located and arrested Arnold and Turner and collected numerous pieces of evidence. In early February 2020, detectives learned that Harris was incarcerated at the Scioto County Jail and traveled there to speak with him. Law enforcement continued to gather evidence.

{¶ 5} On June 3, 2020, Harris was charged in a 15-count indictment with two counts of aggravated murder (while committed aggravated burglary) (Counts 1 & 8), two counts of murder (proximate result of committing aggravated burglary) (Counts 2 & 9), two counts of murder (proximate result of committing felonious assault) (Counts 3 & 10), two counts of aggravated burglary (physical harm) (Counts 4 & 11), two counts of aggravated burglary (deadly weapon) (Counts 5 & 12), two counts of felonious assault (serious physical harm) (Counts 6 & 13), two counts of felonious assault (deadly weapon) (Counts 7 & 14), and one count of having weapons while under disability (Count 17). All counts, except having weapons while under disability, included a firearm specification. Counts 1-4 and 6-7 pertained to McGee; Counts 8-11 and 13-14 pertained to Huntley. Counts 5 and 12 referenced the apartment address only. Turner and Arnold were similarly charged in the same indictment. Ogletree had previously been indicted on two counts of aggravated murder and tampering with evidence under the same case number.

{¶ 6} Although the trial court promptly set bond and appointed counsel for Harris, the record does not plainly indicate when the indictment was served. On July 13, 2020,

appointed counsel filed a joint discovery request and acknowledgment of receipt of discovery from the State.   Harris appeared for his arraignment on July 14, 2020.   At that time, he remained incarcerated in the Scioto County Jail on unrelated charges.

{¶ 7} Harris sought a continuance and, a couple weeks later, signed a speedy trial waiver.   Soon thereafter, he was convicted of felony charges in Scioto County and, beginning on August 25, 2020, was imprisoned until February 2021.   Harris withdrew his speedy trial waiver on April 19, 2021.   The trial court scheduled his jury trial (to be held jointly with Turner) for October 25, 2021.   However, that trial date was rescheduled after Harris's defense counsel withdrew due to a conflict of interest.

{¶ 8} The matter proceeded to a joint jury trial with Turner on January 3, 2022.   As to Harris, the jury could not reach a verdict on the aggravated murder charges (Counts 1 and 8), and those counts were dismissed.   The jury found Harris guilty of the remaining charges and specifications.   After merging several counts and specifications, the trial court orally sentenced Harris to a mandatory term of 15 years to life on both Counts 3 and 10 (murder), plus three years for each attendant firearm specification, to be served consecutively.   The court imposed a minimum term of five years and a maximum term of 7.5 years in prison for aggravated burglary (Count 5), to be served consecutively to Counts 3 and 10 and their specifications.   Harris also received 36 months in prison for having weapons while under disability (Count 17), to be served concurrently.   The court ordered Harris to pay restitution but waived court costs and fees.   Harris's aggregate sentence based on the oral pronouncements was a minimum of 41 years to life to a maximum of 43½ years to life in prison.   However, the trial court's judgment entry stated

that Harris's aggregate sentence was a "minimum of forty-one (41) years to a maximum of fifty-two and a half (52.5) years to life."

{¶ 9} Harris appeals from his convictions, raising four assignments of error. We will address them in a manner that facilitates our analysis.

## II. Speedy Trial

{¶ 10} In his second assignment of error, Harris claims that his statutory and constitutional rights to a speedy trial were violated.

### A. Statutory Speedy Trial Claim

{¶ 11} Ohio has two speedy trial statutes: R.C. 2945.71 and R.C. 2941.401. R.C. 2945.71, Ohio's general speedy trial statute, "was implemented to incorporate the constitutional protection of the right to speedy trial," *Brecksville v. Cook*, 75 Ohio St.3d 53, 55, 661 N.E.2d 706 (1996), and it applies to most cases. R.C. 2941.401 provides a different speedy trial mechanism when a defendant is serving an Ohio prison sentence in another case.

{¶ 12} R.C. 2945.71 designates specific time requirements for the government to bring an accused to trial. Under that statute, a felony defendant must be brought to trial within 270 days of arrest. R.C. 2945.71(C). Each day the accused is held in jail in lieu of bail is counted as three days. R.C. 2945.71(E). A defendant must be brought to trial within the time set by statute unless time is tolled by one of the exceptions found in R.C. 2945.72. *State v. Dankworth*, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 40 (2d Dist.). For instance, time may be tolled for "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the

accused's own motion."   R.C. 2945.72(H).

{¶ 13} A defendant can establish a prima facie case for a speedy trial violation by demonstrating that the trial was held past the time limit set by statute for the crime with which the defendant is charged.   *State v. Gray*, 2d Dist. Montgomery No. 20980, 2007-Ohio-4549, ¶ 15.   "If the defendant can make this showing, the burden shifts to the State to establish that some exception[s] applied to toll the time and to make the trial timely.   If the State does not meet its burden, the defendant must be discharged. R.C. 2945.73." *Id.*

{¶ 14} When a person under indictment becomes imprisoned in Ohio on an unrelated offense, the general speedy trial statute ceases to govern and the 270-day speedy trial deadline for felonies is tolled.   *E.g., State v. Mize*, 2022-Ohio-3163, 195 N.E.3d 574, ¶ 33 (2d Dist.), citing *State v. Stewart*, 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, ¶ 21; *State v. Beckett*, 7th Dist. Harrison No. 06 HA 584, 2007-Ohio-3175, ¶ 25.   Instead, the provisions of R.C. 2941.401 control.   *Id.*   R.C. 2941.401 requires an imprisoned defendant to be brought to trial within 180 days after the defendant provides written notice of the place of imprisonment and a request for final disposition of the pending matter.   The 180-day speedy trial deadline under R.C. 2941.401 does not begin to run until the defendant sends the written notice and request in the manner required by the statute.

{¶ 15} Upon completion of the prison sentence, the general speedy trial statute again governs.   *E.g., Cleveland Hts. v. Coleman*, 8th Dist. Cuyahoga No. 109527, 2021-Ohio-846, ¶ 19-20; *Beckett* at ¶ 40; *State v. Clark*, 12th Dist. Warren No. CA2007-03-037,

2008-Ohio-5208, ¶ 37; *State v. Beverly*, 4th Dist. Ross No. 04CA2809, 2005-Ohio-4954.

{¶ 16} A defendant may waive his or her right to a speedy trial. *State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, 971 N.E.2d 937, ¶ 18. "Speedy-trial waivers are distinct from the provisions in R.C. 2945.72 that extend the statutory speedy-trial time by tolling it." *State v. Reeves*, 2d Dist. Greene No. 2015-CA-12, 2016-Ohio-5540, ¶ 15, citing *State v. Kerby*, 162 Ohio App.3d 353, 2005-Ohio-3734, 833 N.E.2d 757, ¶ 62 (2d Dist.).

{¶ 17} If a defendant revokes a speedy trial waiver of unlimited duration, the speedy trial requirements found in R.C. 2945.71 no longer apply. *State v. Carr*, 2d Dist. Montgomery No. 22603, 2009-Ohio-1942, ¶ 31, citing *State v. Saphire*, 2d Dist. Greene No. 2000-CA-39, 2000 WL 1803852 (Dec. 8, 2000), citing *State v. O'Brien*, 34 Ohio St.3d 7, 516 N.E.2d 218 (1987). Rather, following revocation of the waiver, a defendant must be tried within a reasonable time. *Id.* In reviewing whether the time was reasonable, we consider whether the defendant's constitutional speedy trial rights have been violated. *See Saphire* at *2 (employing the analysis set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

{¶ 18} In this case, the record does not disclose when Harris was arrested on the charges, which is significant because the speedy trial clock begins to run on the day following a defendant's arrest. *E.g., Reeves* at ¶ 16; *State v. Lee*, 2d Dist. Montgomery No. 20012, 2004-Ohio-668, ¶ 11. The parties agree that, when Harris was indicted, he was incarcerated at the Scioto County Jail on unrelated charges. Although the trial court promptly set bond and appointed counsel, there is no indication prior to July 14, 2020

(when Harris pled not guilty, the trial court again set bond, and the court withdrew the warrant on the indictment) that Harris had been arrested on the indictment in this case. In his appellate brief, Harris uses July 14, 2020 as the date when his speedy trial time commenced. Given the record before us, we will follow Harris's lead.

{¶ 19} Assuming that Harris's speedy trial time began to run on July 14, 2020, 15 days elapsed between the start of his speedy trial time and the day he filed a motion for a continuance (July 29), a statutory tolling event. Because Harris was incarcerated on other unrelated charges during this time, the triple-count provision did not apply. *E.g., State v. Taylor*, 2d Dist. Montgomery No. 28463, 2020-Ohio-3481, ¶ 34. The trial court granted a continuance until August 4, 2020, on which date Harris moved for separate trials, which again tolled the statutory speedy trial time. On August 11, 2020, Harris filed a written speedy trial waiver, which then stopped the running of his statutory speedy trial time indefinitely.

{¶ 20} Two weeks later, Harris was imprisoned on felony charges out of Scioto County. At this juncture, R.C. 2945.71 ceased to govern Harris's speedy trial deadline, and R.C. 2941.401 controlled instead. Harris never took any action while imprisoned to trigger the 180-day speedy trial deadline under that statute. He was released from prison in February 2021, at which point R.C. 2945.71 again governed. Significantly, Harris had never revoked his speedy trial waiver, and thus the waiver remained in effect during his imprisonment and following his release from prison. Due to a detainer placed on Harris in this case while he was incarcerated at the Toledo Correctional Institution, Harris remained incarcerated following the completion of his Scioto County prison sentence.

{¶ 21} Harris moved to revoke his speedy trial waiver on April 6, 2021. Because the entirety of the period between July 29, 2020, and April 6, 2021 was tolled, only 15 speedy trial days had elapsed when Harris withdrew his speedy trial waiver – an amount well within the 270-day statutory speedy trial limit. In short, because Harris waived his speedy trial right before the statutory deadline, his statutory speedy trial claim lacks merit. *See State v. Woodard*, 2d Dist. Montgomery No. 29110, 2022-Ohio-3081, ¶ 29. We therefore turn to whether his constitutional speedy trial rights were violated.

**B. Constitutional Speedy Trial Claim**

{¶ 22} The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. Under constitutional standards, a defendant must be brought to trial within a reasonable time. *State v. Long*, 163 Ohio St.3d 179, 2020-Ohio-5363, 168 N.E.3d 1163, ¶ 13.

{¶ 23} In reviewing whether there has been a denial of a defendant's constitutional speedy trial rights, courts consider four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant. *Long* at ¶ 14, citing *Barker*, 407 U.S. at 523, 92 S.Ct. 2182, 33 L.Ed.2d 101. "No single factor controls the analysis, but the length of the delay is important. 'Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.' " *Id.*, quoting *Barker* at 530.

{¶ 24} In this case, we focus on the delay between the revocation of Harris's speedy trial waiver and the commencement of his trial. At the April 6, 2021 scheduling conference (at which defense counsel informed the court that Harris wished to withdraw

his speedy trial waiver), the parties discussed possible trial dates. The prosecutor told the court that "just based on the Court's calendar, Defense counsel's calendar, and the State's calendar, the earliest that any of us could set it was this October 25th date. And even though he does wish to revoke his time waiver, I believe the October 25th date is the soonest date that the court could get – the trial date. And providing – even with the revocation of the time waiver, we have reasonable time." Tr. 14. Based on that representation, the court found that October 25, 2021 was "the soonest reasonable date that this matter can be tried." Tr. 14.

{¶ 25} On October 19, 2021, defense counsel filed a motion to withdraw based on a conflict of interest. Two days later at a hearing on the motion, defense counsel explained that had recognized Harris's co-defendant's name when he was appointed as counsel and thought that he may have represented the co-defendant as a juvenile. After investigating that possibility, counsel did not find any indication that he had done so. However, when reviewing the co-defendant's criminal history, he realized that he had represented the co-defendant in adult court. The court discussed the matter with Harris, who did not object to counsel's withdrawal. The trial court granted the motion to withdraw on October 22, 2021.

{¶ 26} On October 25, 2021, Harris, pro se, filed a motion to dismiss due to a violation of his speedy trial rights. The same day, the trial court issued an order extending the speedy trial time until the next scheduled trial date, pursuant to R.C. 2945.72. The trial court cited the assigned judge's pending retirement, the need to submit the case for random assignment, and that a new trial date could not be determined

until this reassignment and the appointment of new counsel.

{¶ 27} At a scheduling conference on November 2, 2021, the prosecutor told the court that a different judge (who had handled some prior hearings in the case) was willing to try the case on January 3, 2022. The parties agreed to address discovery matters. The State subsequently opposed Harris's speedy trial motion, and the trial court denied the motion on November 9, 2021. The matter proceeded to trial on January 3, 2022, as scheduled.

{¶ 28} We find the length of the delay between the revocation of the speedy trial waiver and Harris's trial to be reasonable. The record reflects that the October 25 trial date was the first date mutually available for the parties and the court. However, defense counsel's conflict of interest necessitated his withdrawal from the case and the setting of a new trial date. Trial commenced 10 weeks later. Given the number and serious nature of the charges and the volume of discovery to be reviewed, the additional 10-week delay between defense counsel's withdrawal and the commencement of trial with new counsel was reasonable.

{¶ 29} Harris asserts on appeal that the delay between his arraignment (July 14, 2020) and his trial (January 3, 2022) violated his constitutional speedy trial rights. This argument similarly lacks merit. Although Harris's case was pending for more than a year, he filed a speedy trial waiver less than a month after his arraignment, and that waiver remained effective for approximately eight months (August 11, 2020 to April 6, 2021). Harris's trial was held within a reasonable time following the withdrawal of the waiver, and therefore no constitutional speedy trial violation occurred.

**{¶ 30}** Harris's second assignment of error is overruled.

## II. Sufficiency and Manifest Weight of the Evidence

**{¶ 31}** In his third assignment of error, Harris claims that the guilty verdicts were based on insufficient evidence and were against the manifest weight of the evidence. He asserts that the State failed to present sufficient evidence of "each and every element of each and every offense for which Harris was convicted." However, his primary argument appears to be that the State did not establish identity, i.e., that he was one of the participants in the home invasion and resulting homicides at the Ethel Avenue apartment.

### A. Relevant Legal Standards

**{¶ 32}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

**{¶ 33}** Evidence supporting the sufficiency of the evidence may be introduced during the defense's case-in-chief. *State v. Stokes*, 2d Dist. Champaign No. 2015-CA-22, 2016-Ohio-612, ¶ 26, citing *State v. Richardson*, 2015-Ohio-757, 29 N.E.3d 354, ¶ 22, *reversed on other grounds*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993. Unlike

a review of the denial of a Crim.R. 29(A) motion at the end of the State's case-in-chief, which is limited to the State's evidence, we consider all of the evidence admitted at trial, regardless of the proponent of the evidence, when reviewing the sufficiency of the evidence generally.

{¶ 34} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 35} We recognize that, in another assignment of error, Harris challenges the trial court's admission of certain evidence, namely two short surveillance videos from outside the Ethel Avenue apartment. However, when reviewing claims based on the sufficiency or manifest weight of the evidence, we are required to consider all the evidence admitted at trial, regardless of whether it was admitted erroneously. *See State*

*v. Fleming*, 2d Dist. Clark No. 2021-CA-40, 2022-Ohio-1876, ¶ 27, citing, *e.g., State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284. Accordingly, we must consider the disputed video clips in conducting our analysis.

### B. Sufficiency of the Evidence

{¶ 36} All of Harris's co-defendants testified at trial. Ogletree pled guilty to aggravated murder and tampering with evidence related to the incident and testified against Turner and Harris on behalf of the State; Ogletree identified himself, Turner, Arnold, and "Booman" (who was identified by multiple witnesses as Harris) as the perpetrators. Arnold testified on behalf of Turner, and Turner testified in his own defense. Their testimony differed from Ogletree's, including who participated in the offenses and what occurred after fleeing from the scene. For the purposes of our review of the sufficiency of the evidence, we focus on the evidence that supported Harris's convictions, beginning with Ogletree's version of events.

### 1. Ogletree's Version of Events

{¶ 37} According to Ogletree, he, Arnold, Turner, and Booman were together at the Uptown Lounge at 1235 West Third Street in Dayton at various times during the overnight hours of December 20, 2019 into December 21, 2019. Ogletree originally went to the Uptown Lounge with Turner and Arnold, both of whom he had known for a couple of months. At some point, Ogletree left to pick up Booman from his apartment near Miller Lane and brought him back to the Uptown Lounge. Ogletree rejoined Turner and Arnold and watched those two perform in an open mic competition. At approximately 2:00 a.m. on December 21, Ogletree left again to pick up his sister from work, and he also drove

her back to Uptown Lounge.    Ogletree again rejoined Turner, Arnold, and Booman.

{¶ 38} The four ultimately left the Uptown Lounge together in Ogletree's car. While driving around, they discussed committing a robbery and decided to rob McGee and Huntley's residence on Ethel Avenue, which Turner and Ogletree had visited earlier in the day.    Ogletree acknowledged that they were looking to get drugs, money, and firearms.

{¶ 39} When they arrived at the Ethel Avenue apartment building, Ogletree parked in a nearby alley.    Ogletree, Turner, and Arnold put on face coverings; Booman wore a hoodie over his head.    Ogletree testified that he had a Smith & Wesson .38 revolver, Turner had Glock 17 9mm handgun that had been stolen from a police officer, and Arnold had a Hi-Point 9mm handgun.    Ogletree reported that Booman was not armed.

{¶ 40} According to Ogletree, Booman originally expressed that he did not want to participate in the robbery.    Nevertheless, Booman kicked in the front door, and all four entered the apartment.    Once inside, Ogletree headed to the rear bedroom, where he saw Huntley apparently reaching toward him.    Ogletree shot Huntley five times, then left the room.    Ogletree stated that Arnold came into the rear bedroom after him, and Ogletree heard additional gunshots.    Ogletree saw Turner "tearing up" the living room, looking for items to steal, and Booman standing near the front door.    Ogletree then went into the front bedroom, with Turner following behind him.    There, they found McGee hiding under the bed.    Turner and McGee "tussled" until Turner managed to push McGee away.    Turner then shot McGee numerous times.    Turner also shot Ogletree in the left forearm and himself in the hand during the melee.

{¶ 41} After being shot, Ogletree ran back to his car, and the others followed. Ogletree testified that he had taken a microphone from the apartment, and someone else had stolen a bag of cigar guts. Once in his car, Ogletree drove a short distance, but he was unable to continue due to his injury. Booman then drove the group to a Rally's, where they met up with an individual that Ogletree believed was Turner's father. Ogletree and Turner left with Turner's father; Ogletree stated that he left his cell phone in his car. Turner's father ultimately dropped off Ogletree near Springfield Regional Medical Center, where Ogletree received treatment for his gunshot wound. While walking to the hospital, Ogletree threw his revolver into a wooded area near a Rite Aid across the street from the hospital.

*2. Evidence Supporting Ogletree's Version of Events*

{¶ 42} Substantial evidence corroborated Ogletree's version of events and established that Huntley and McGee had been murdered as a proximate result of both aggravated burglary and felonious assault.

{¶ 43} Numerous witnesses placed Ogletree, Turner, Arnold and Booman together at the Uptown Lounge prior to the shooting. Arnold and Turner each corroborated that they had gone to the Uptown Lounge for an open mic competition and spent time with Ogletree and Booman/Harris. An analysis of Ogletree's and Turner's cellphones by Special Agent Lance Kepple, a member of the Federal Bureau of Investigation's Cellular Analysis Survey Team (CAST), showed that between approximately 2:00 a.m. and 2:45 a.m. on December 21, 2019, the usage of Turner's and Ogletree's phones was consistent with their being at or near the Uptown Lounge.

{¶ 44} Photographs of Ogletree, Turner, Arnold, and Booman at the Uptown Lounge were located on Ogletree's phone. Several of those photos were taken between 3:30 and 4:00 a.m. on December 21, 2019. Ogletree, Ogletree's sister, and Turner all identified the four in the photos.

{¶ 45} The State's evidence also supported a conclusion that Ogletree, Turner, Arnold, and Booman had gone to the Ethel Avenue apartment. According to Special Agent Kepple, from approximately 4:45 a.m. to 5:20 a.m., Turner's, Ogletree's, and Arnold's phones were using cell towers consistent with being at or near the Ethel Avenue apartment. Surveillance video from outside the Ethel Avenue apartment showed four men approaching the front door of the apartment, three of whom had face coverings and the fourth wearing a hoodie. When shown the surveillance videos from outside the Ethel Avenue apartment and still photos taken from those videos, Ogletree again pointed out himself, Turner, Arnold, and Booman. Ogletree testified that the surveillance video depicted Arnold wearing a letterman jacket and Booman wearing the same distressed-style pants that he had worn in the Uptown Lounge photos. Ogletree had a photo of Arnold wearing the same letterman jacket a few days before, and Arnold himself acknowledged wearing that jacket at the Ethel Avenue apartment. The video and Arnold's testimony substantiated that Booman (wearing the hoodie) kicked in the door shortly before the shootings.

{¶ 46} Huntley called 911 at 5:22 a.m., and the police and medics were dispatched to his apartment. When medical help arrived, Huntley was conscious but was having difficulty breathing. The responding paramedic noticed "penetrating wounds" to the left

side of Huntley's face, chest, left abdomen, and left upper arm. He was taken to the hospital, where he died a week later. According to the coroner, Huntley had been shot eight times, developed an infection while hospitalized, and died as a result of complications from multiple gunshot wounds.

{¶ 47} McGee was deceased when first responders arrived. The coroner testified that McGee had been shot 11 times, including gunshots to his right temple next to his eye, left and right shoulders, right forearm, left side of his chest, left hip, and left thigh.

{¶ 48} Responding police officers observed that the front door to the Ethel Avenue apartment had been forced open, noting that they could see the broken locking mechanism and fresh splinters of wood. Officers further observed that the apartment had been ransacked. Arnold agreed that the plan had been to steal things from the apartment, and he admitted to taking marijuana. A water pipe had been hit by a bullet, and Officer David Lane turned the water off to preserve evidence. Officers noticed multiple bullet holes in the door to the back bedroom.

{¶ 49} Evidence technicians collected ten Federal Cartridge 9 mm Luger casings and eight Winchester 9 mm Luger casings from the scene, as well as bullets, bullet fragments, and other items. Analysis from a firearm expert determined that all of the Winchester casings and seven of the Federal Cartridge casings could be matched to a black Glock 17, serial number WMU977, which had been recovered by Officer Jamie Luckoski at an illegal liquor establishment on January 31, 2020. That weapon had been stolen from the trunk of Officer Linville Jenkins's vehicle on December 9, 2019. Most of the casings fired by the Glock were found in or near the front bedroom where McGee had

been shot. Turner admitted that the Glock used for the crimes at Ethel Avenue was his gun. He said that the person who sold him the gun had said it was stolen from a police officer, and that he had relayed that information to Ogletree.

{¶ 50} Ogletree testified that he had used a .38 caliber Smith and Wesson revolver to shoot the man in the back bedroom (Huntley). Following his arrest, Ogletree showed detectives where to find the revolver near a Rite Aid in Springfield. The revolver contained five spent cartridge casings (the capacity of the firearm was five cartridges). The five spent bullets from Ogletree's revolver were recovered: one from the hospital emergency room while Huntley was being treated there, two during Huntley's autopsy, and two from Huntley's back bedroom.

{¶ 51} Ogletree reported that Arnold had brought a Hi-Point 9 mm firearm, which he also fired in the apartment. Evidence technicians found additional spent casings that had been fired from an unknown weapon at the Ethel Avenue apartment. (Two additional weapons – a Taurus PT92 AFS 9mm Luger pistol and a SIG Sauer P937 semiautomatic pistol – were found in the living room; neither weapon appeared to be associated with these offenses.)

{¶ 52} Officers noted a trail of blood from the front of the Ethel Avenue apartment to the nearby alley; a pair of shoes was found along the route. Laboratory analysis determined that several blood samples from the trail came from Ogletree and that Ogletree's blood was on the shoes.

{¶ 53} At approximately 5:40 a.m. that morning, Turner's phone was heading north from the Ethel Avenue area toward his father's residence. Turner testified that he had

been with Ogletree and Arnold at a location near his father's residence, and Turner and his father both testified that they had driven Ogletree from there to a hospital in Springfield. At 5:49 a.m., Turner's phone was located in downtown Dayton.

{¶ 54} Ogletree's Chrysler 200 drove to and parked behind 1609 Weaver Avenue. The homeowner contacted the police later that day and provided surveillance video that showed the vehicle's arrival. Testing of blood found in the car indicated Ogletree's blood in the driver's compartment and on the driver's seat; Turner's blood was found on the front passenger door.

{¶ 55} Shortly before 6:00 a.m., Ogletree's and Arnold's phones were using cell towers consistent with being at or near both 1609 Weaver Street and 28 Bragg Place, Arnold's girlfriend's residence. Around the same time, Turner's phone was moving at highway speeds from Dayton to Springfield.

{¶ 56} At approximately 6:15 a.m. on December 21, 2019, Ogletree arrived at the Springfield Regional Medical Center for treatment for a gunshot wound to the arm. Security footage confirmed his walking through a parking lot and into the building. At approximately the same time, Ogletree's mother received a phone call and messages from someone using Ogletree's phone. The person told her that Ogletree was at a hospital in Springfield, but she needed to get his car and phone, which were near the intersection of Stewart Street and Danner Avenue (a few blocks from 1609 Weaver Avenue).

{¶ 57} On December 22, 2019, officers went to 28 Bragg Place, where they located and arrested both Arnold and Turner. Officers observed that Turner had a gunshot

wound to his hand.

*3. Evidence Related to Harris's Identity and Having Weapons Under Disability*

{¶ 58} Two witnesses – Arnold and Sergeant Walter Steele of the Montgomery County Sheriff's Office – expressly identified the moniker "Booman" as Harris.

{¶ 59} Sergeant Steele, who worked with the Dayton Homicide Unit, testified that he had previously spoken with Booman on August 21, 2019, concerning a separate investigation in which Booman was a witness. In one interview, Steele spoke with Booman for 45 minutes, and then they spoke for over an hour at the Safety Building. Steele testified that Booman's legal name was Deon Harris. Steele identified "Booman, Deon Harris" as the person shown in State's Ex. 205C-E, photos taken on Ogletree's phone at the Uptown Lounge. In addition, Sergeant Steele noted that Harris did not change his pants between the Uptown Lounge photos and the offense. Looking at a still photo from the Ethel Avenue surveillance video, Steele testified that "[i]t's Deon Harris in the front of the video getting ready to kick the door in." When asked if Booman/Deon Harris was in the courtroom, the Steele identified Harris.

{¶ 60} Sergeant Steele further testified that he saw Harris in Scioto County on February 5, 2020 to get a DNA sample from him. While getting the DNA standard, Harris asked Steele why Arnold was the only one that had not been taken into custody. (Arnold had, in fact, been arrested.)

{¶ 61} Testifying on behalf of Turner, Arnold stated that he, Ogletree, and Booman committed the offenses at the Ethel Avenue apartment. When shown photographs of the group on cross-examination by the State, Arnold identified "Booman" as Deon Harris

and agreed that Harris was the one who had kicked in the door. Arnold also identified Harris at trial.

{¶ 62} Finally, the State presented evidence that Harris had been unlawfully armed with a firearm during the offenses. Although Ogletree had testified that Booman was not armed, the surveillance video from outside the Ethel Avenue apartment arguably showed that he had a firearm. While discussing a still photo from the Ethel Avenue surveillance video, Detective Williams noted that the handle of a pistol was sticking out of the left pocket of the hoodie worn by the person who kicked in the door. The State presented evidence that Harris had previously been convicted of aggravated robbery with a deadly weapon, which precluded him from lawfully possessing a firearm.

{¶ 63} In summary, construing the evidence in the light most favorable to the State, there was sufficient evidence that Harris, while armed with a firearm, went to the Ethel Avenue apartment with three accomplices with the intent to commit a robbery. The evidence further supported the conclusion that Harris had kicked open the door of the apartment, the group entered, and during the burglary, Harris's accomplices fatally shot Huntley and McGee. The evidence was sufficient to support the jury's verdicts on each offense and specification for which Harris was found guilty.

### C. Manifest Weight of the Evidence

{¶ 64} Harris further argues on appeal that his convictions were against the manifest weight of the evidence. He emphasizes that the State's case against him was built primarily on the testimony of Ogletree and Arnold, who reached plea agreements with the State, and he argues that their testimony was not credible. Harris further notes

that the State did not produce any DNA evidence that placed Harris at the scene or in Ogletree's car.

{¶ 65} We recognize that additional evidence was presented at trial from which the jury could have reasonably concluded that Harris was not one of the perpetrators. As noted by Harris, Harris's DNA was not found at or around the Ethel Avenue apartment, and none of the DNA found in Ogletree's vehicle was matched to him. Harris could not be excluded as a contributor to one trace DNA sample from the driver's compartment of Ogletree's Chrysler 200 (Ogletree provided the major component of that mixed DNA sample), but analysis did not definitively place Harris in Ogletree's vehicle.

{¶ 66} Harris's mother, Shileca Murray, testified on Harris's behalf. She stated that Harris had come to her home between 3:00 and 3:30 a.m. on December 21, 2019. She remembered because the television show *Two and A Half Men* was airing. Murray said that she let Harris in, declined his request to cook for him, and went back to bed. She saw Harris sleeping in her youngest son's bed when she got up.

{¶ 67} Testifying for the State, Ogletree identified his accomplices as Arnold, Turner, and "Booman." Ogletree testified that on December 21, 2019, he left the Uptown Lounge, picked up Booman from the Crest Apartments near Miller Lane, and then brought him back to the Uptown Lounge. Ogletree stated that he had previously seen Booman at a different club, Sneaky D's. However, Ogletree never identified "Booman" as Harris. When asked if he saw Arnold, Turner, or Booman in the courtroom, Ogletree pointed out Turner only. He expressly testified that he did not see Booman in the courtroom. Tr. 712.

{¶ 68} Turner, testifying on his own behalf, indicated that that he had gone to the Uptown Lounge for an open mic competition, and he had told his friend, Harris (with whom he had a friendly competition as a rap performer), about the event. Harris performed under the name "Fenom OB." Turner testified, however, that he left Uptown Lounge with Ogletree, Arnold and "some other individual" in Ogletree's vehicle. Although Turner identified Harris at trial, Turner did not place Harris with him, Ogletree, and Arnold after leaving the Uptown Lounge.

{¶ 69} Turner also provided an alternative explanation for the evidence against him. He testified that, after leaving Uptown Lounge, the four drove around for a while, but he was intoxicated and asked to be dropped off. Turner stated that he was left at his grandfather's home, and then he went to his father's home. Turner indicated that he left his gun and his phone in Ogletree's car.

{¶ 70} According to Turner, he met his girlfriend at his father's home, and they spent some time together there. (Turner's girlfriend, Shaniqua Jones, also testified that she went to Turner's father's house to see him, but she did not know what time she had arrived or left.) He was later awakened by his father, who had received a phone call from someone trying to reach Turner so that Turner's gun and phone could be returned to him. Turner's father drove him to a nearby Rally's, where they met Ogletree's vehicle. Arnold was seated in the backseat of Ogletree's car, and the unknown individual was in the front passenger seat holding Turner's Glock. After retrieving his phone from Arnold, Turner tried to grab his gun from the front-seat passenger. Turner testified that the two men struggled over it, causing it to fire and shoot Turner in the hand. Again, Turner did not

identify Harris as the person in Ogletree's vehicle.

{¶ 71} Arnold testified on Turner's behalf and provided a variation of Turner's version of events. He testified that Turner had been dropped off at his home before the others headed to Ethel Avenue, where Arnold "committed the alleged crime." Arnold indicated that Turner had left his phone and gun in Ogletree's car and, after the crime, Arnold contacted Turner's father in an effort to reach Turner so he get his items back. Ogletree drove to a location off Salem Avenue, where they met Turner. According to Arnold, Turner got in the car, there was a "tussle," and Ogletree accidentally shot Turner.

{¶ 72} Akin to Ogletree, Arnold did identify Harris as a participant in the offenses, stating that Harris had kicked in the front door, and he (Arnold) and Ogletree went inside. However, Arnold denied that Turner was present, saying that a fourth person was present, but Arnold did not know who that person was; Arnold did not explain how that person came to be with them at the Ethel Avenue apartment. Also in contrast to Ogletree's version of events, Arnold stated that he had Turner's Glock, that he was the first to shoot the person in the back bedroom, that he found a second occupant under a mattress, and that he shot Ogletree accidentally. Arnold stated that after meeting with Turner following the crimes, he was dropped off at his apartment at 28 Bragg Place by Harris and the unknown person.

{¶ 73} The State vigorously cross-examined Arnold. Arnold admitted on cross-examination that he had not previously given this version of events. On December 22, 2019, the day he was arrested, he had repeatedly and adamantly denied that he was at the Ethel Avenue apartment and claimed that he had been with his girlfriend. On

September 17, 2020, Arnold met the prosecutor and Detective Geiger and provided detailed information about how the offenses had been committed, identifying Turner as the fourth participant and the person who had shot McGee and Huntley. Arnold also said that he feared Turner, that his (Arnold's) girlfriend was being threatened, and that Turner, not him, had called Turner's father. In an August 2020 email to Ogletree's sister, Arnold identified Ogletree, Harris, Turner, and himself as the perpetrators of the crimes. In reaching a plea agreement, Arnold had told the prosecutor that he had no exculpatory evidence to offer on his co-defendants' behalf. At trial, however, Arnold asserted that he had lied during his December 22 and September 17 interviews and that his email to Ogletree's sister was not true.

{¶ 74} On cross-examination of Turner, Turner admitted that he had originally told officers that he was injured in a lawnmower accident and then later said that he was shot at a different location. Turner maintained, however, that he was shot while trying to grab his gun from an unknown individual in Ogletree's car.

{¶ 75} The State also offered testimony from Detective Geiger in rebuttal. With respect to Harris's mother, Shileca Murray, Geiger noted that Murray did not contact the police about Harris's whereabouts on December 21, 2019 until the Sunday before trial. He further noted that, contrary to Murray's testimony, the photos from Ogletree's phone placed Harris at the Uptown Lounge after 3:30 a.m. on December 21, 2019. Geiger further testified about the statements Arnold had made in his December 22 and September 17 interviews. The detective also noted that Arnold had been in contact with members of Turner's family during the pendency of the case.

{¶ 76} Upon review of the evidence as a whole, the jury could have reasonably concluded that the offenses had not occurred as Ogletree described and that Harris had not been involved in the offenses. No physical evidence tied Harris to the offenses. Ogletree did not identify Booman as Harris, and Turner stated that Harris was a rap performer known as Fenom OB. Turner did not place Harris in Ogletree's car upon leaving the Uptown Lounge, and Harris's mother provided Harris an alibi for when the offenses occurred. Turner and Arnold contradicted Ogletree's testimony that Turner had participated in the home invasion and the shootings. In doing so, they provided an alternative explanation for why Turner's phone was near Ethel Avenue when the incident occurred, how Turner was shot, and why his blood was in Ogletree's car. Although Arnold testified that Harris participated in the crimes, Turner's and Arnold's alternative version of events offered the jury a basis to question the State's version of events and its interpretation of the evidence. On the other hand, the State, through cross-examination and rebuttal, presented additional evidence from which the jury could have reasonably concluded that Murray's alibi evidence and Turner's and Arnold's versions of events were not credible.

{¶ 77} It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Harris had committed the charged offenses. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. The jury could have reasonably rejected the version of events offered by defense witnesses and, instead, believed that Harris

participated in the burglary of the Ethel Avenue apartment and the shooting deaths of Huntley and McGee. We cannot conclude that the jury lost its way when it ostensibly credited the State's version of events and found Harris guilty of the aggravated burglary, felonious assault, murder, and having weapons while under disability charges. Harris's convictions were not against the manifest weight of the evidence.

{¶ 78} Harris's third assignment of error is overruled.

### III. Admission of Video Clips and Denial of Motion for Mistrial

{¶ 79} In his fourth assignment of error, Harris claims that the trial court abused its discretion when it failed to exclude the two 19-second surveillance video clips from outside the Ethel Avenue apartment (State's Exhibit 68), which Detective Williams had retrieved from a tablet provided by Huntley's girlfriend, Ashley Brown. Harris further claims that the trial court abused its discretion in denying his motion for a mistrial.

{¶ 80} Harris first challenged the State's use of the surveillance video from outside the Ethel Avenue apartment in a motion in limine, filed December 20, 2021. Harris argued in his motion that "[t]he full length of the recordings has not been made available nor have the particulars of its making been shared with the defense." He asserted that, without the ability to view the entire video, the admission of the two 19-second clips would be erroneous.

{¶ 81} The parties discussed the motion with the trial court on December 22, 2021. At that time, Harris's counsel stated that he did not know what else the surveillance system had recorded, other than the 19-second videos that he had seen. He also expressed concern about a lack of information about where the videos came from, what

kind of camera was used, and whether the reported times on the videos were correct. In response, Detective Geiger indicated that the 19-second videos were "all that we were provided." The detective stated that officers observed two exterior cameras, which evidence technicians photographed, and "[i]t was later on in the day that the decedent's girlfriend provided us the video." Geiger further explained that they had looked for a DVR or another device that recorded the video, but none was located, and that it was possible that the cameras went "straight to the cloud." The trial court preliminarily ruled that the videos would be admissible if there were some foundation laid as to where the videos came from.

{¶ 82} On the second day of trial, Detective Williams testified about how he obtained surveillance videos from the cameras outside the Ethel Avenue apartment. He explained that these surveillance cameras had only a power cord, which indicated that the video would be stored on the camera itself or in the cloud, rather than on a hard drive/DVR. Williams observed a micro SD card slot on the cameras, but found no SD cards. The detective testified that with a cloud-based system, the only way to obtain the videos would be to find the device with the application to view the videos.

{¶ 83} Williams then recounted how he obtained the videos. He stated that at approximately 5:00 p.m. on December 21, 2019 (the day of the shooting), he met with Brown, who provided him a black Samsung tablet (State's Exhibit 193) with an application called Momentum on it. Williams testified that he opened the application, found "the videos that I needed," downloaded them to the tablet, and then emailed the videos to himself so he could view them on his work computer. Williams said that there were

"three, maybe four" videos that pertained to the investigation, and two videos were from around the time of the incident. Williams described how he corroborated that the two videos were taken from outside the Ethel Avenue apartment.

{¶ 84} Just prior to the playing of the videos, Harris's counsel asked for a sidebar discussion. Counsel noted that the evidence tag for the tablet indicated that it was placed into evidence in October 2020, but the information on the tablet had not been made available to him. Counsel questioned whether there was more video, including what happened after the door was kicked in. He summarized: "There's two things. There's got to be more information, and it wasn't supplied in the time it was asked. And for that reason, I'd object to it being played or being admitted at this time." Tr. 556.

{¶ 85} In response, the prosecutor emphasized that the two 19-second videos had been provided to defense counsel "the whole time." She also noted that sometimes cell phones and tablets are not packaged right away. To obtain clarification of what happened, the court allowed voir dire of Detectives Williams and Geiger outside the presence of the jury.

{¶ 86} Upon additional questioning, Detective Williams stated that Brown had contacted him and said there was video. When the detective went to her home, Brown gave him the tablet and said that she thought videos were on it. Detective Williams saw a few applications on the tablet and thought Momentum was likely the one he needed. Upon opening it, he saw it was a feed to cameras. Williams was able to go back earlier in the day, and he found the two videos from around the time of the incident. He downloaded them to the tablet and then emailed them to himself. Detective Williams did

not download any videos beyond the two short clips. He testified that he "couldn't tell you how many clips that were on [the Momentum app]," but he did not learn of any other videos that were pertinent to the case. The detective noted that cloud-based recording systems often are motion-based and record only triggered events. Williams was only concerned with events that occurred around the time of the shootings; he did not look further back than a few hours before the incident to see if other videos were available.

{¶ 87} When asked why the video showing the group's approach to the front door ended abruptly, Detective Williams responded that the video ended when force was applied to the door. He surmised that, since the electrical outlet was three to four feet from the doorframe, the cameras lost power when the door was kicked in. Both cameras were plugged into the same outlet.

{¶ 88} Detective Williams further testified that cell phones and tablets are often kept in the detectives' office and not packaged on the date collected. He could not explain why it took almost a year for the tablet to be tagged into evidence.

{¶ 89} Detective Geiger confirmed that he had received both the 19-second videos and the tablet approximately 16 hours after the incident. He had kept the tablet with the case file, because "there was potential to have to show this video to other people" and there was an issue as to whether the tablet would be returned to Brown. Geiger stated that he submitted the tablet to the property room on October 20, 2020.

{¶ 90} Detective Geiger further testified that, during a pretrial conference following the filing of Harris's motion in limine, he turned on the tablet and opened the Momentum app. He saw the two 19-second surveillance videos, as well as other videos from 1:00

a.m. on December 19, 2019. Those additional videos were transferred to a thumb drive and provided to defense counsel. Geiger did not attempt to contact the Momentum app company for additional information, because he did not know who the account holder was. Geiger testified that the 19-second videos were continuous (although the time-stamp appeared to be off by an hour), with no indication that the videos were edited.

{¶ 91} The trial court determined that the 19-second videos were properly authenticated and reliable. The court overruled Harris's objection to their admissibility.

{¶ 92} Following the court's ruling, Harris's counsel moved for a mistrial, citing the fact that they had not had the opportunity to access the videos themselves or to contact Momentum. Counsel continued: "Det. Williams said this was a motion based camera, and from the information that the Defense has received from police reports, there was a lot of activity, and that none of those videos are there. I believe (indiscernible) that represents a failure on the part of the Government to provide discovery that would be potentially exculpatory and helpful to the Defense. And for that reason, I'd like the record to reflect that I request for a mistrial."

{¶ 93} The trial court denied the motion for a mistrial, explaining that "the State is not required to go find evidence for you. The State is required to turn over any exculpatory evidence that it has or it reasonably could have. And the two detectives have satisfied me sufficiently that they have appropriately reviewed that evidence and that there is no other exculpatory, or evidence, that the State failed to turn over." Tr. at 588-589.

{¶ 94} On appeal, Harris claims that the trial court should have excluded the two

19-second surveillance videos as a discovery sanction for the State's failure to provide the Samsung tablet, access to the tablet, or a copy of its contents. He argues that having foreknowledge of the complete contents of the tablet would have assisted his defense. Alternatively, Harris claims that the trial court should have granted him either a mistrial or a continuance.

{¶ 95} Crim.R. 16 governs discovery in criminal cases. The purpose of the Rule "is to provide all parties * * * with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). The Rule aims " 'to prevent surprise and the secreting of evidence favorable to one party.' " *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987).

{¶ 96} Crim.R. 16(B) directs the State to provide a defendant "items related to the particular case indictment * * *, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial[.]" Those items include, among other things, "documents, photographs, [and] tangible objects," Crim.R. 16(B)(3), and "[a]ny evidence favorable to the defendant and material to guilt or punishment," Crim.R. 16(B)(5).

{¶ 97} If it comes to the court's attention that a party has failed to comply with Crim.R. 16, the trial court may "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

Crim.R. 16(L)(1).

{¶ 98} "A trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138, at paragraph two of the syllabus. "In exercising its discretion when the discovery violation is committed by the State, trial courts should consider: (1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefitted the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *State v. Hunt*, 2d Dist. Darke No. 2018-CA-9, 2019-Ohio-2352, ¶ 30, citing *Darmond,* 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983).

{¶ 99} We review a trial court's discovery sanction decision for an abuse of discretion. *E.g., State v. McHenry*, 2021-Ohio-3118, 176 N.E.3d 1224, ¶ 16 (2d Dist.). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Darmond* at ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 100} The record does not substantiate a discovery violation by the State as to the 19-second videos themselves. Detective Williams testified that the surveillance videos were recorded with a cloud-based system, and he described how he viewed the two short videos with an application on the Samsung tablet and then emailed the downloaded videos to himself. The testimony of Detectives Williams and Geiger reflects

that the surveillance cameras captured two separate 19-second videos, which were continuous and showed no signs of being edited. The State provided those videos to Harris's original trial counsel on July 7, 2020, as part of its first discovery packet. The detectives conveyed that the videos provided to defense counsel were the entirety of what they viewed via the Momentum app. There is no evidence that the State failed to provide the complete videos of what occurred outside the Ethel Avenue apartment shortly before the incident.

{¶ 101} With respect to other videos accessible through the Momentum app, Detective Geiger testified that he reviewed the available videos after Harris filed his motion in limine. At that time, he viewed videos from 1:00 a.m. on December 19, 2019. Those additional videos were transferred to a thumb drive and provided to the defense. Although Harris's counsel received those videos shortly before trial, Harris has made no argument that the State should have provided those videos earlier and that he was prejudiced by the timing of this disclosure.

{¶ 102} Harris complains that his attorney was not provided an opportunity to examine the tablet and the items on the Momentum app himself. However, Detectives Williams and Geiger testified that they did not know of any other videos on the Momentum app that were relevant to the offenses at issue at trial. On this record, there is no evidence that the State withheld any evidence that was favorable to Harris or that could have aided Harris with his defense. We therefore cannot conclude that the State committed a discovery violation warranting the exclusion of evidence or another sanction.

{¶ 103} Harris argues that the court should have granted his motion for a mistrial.

Because we find no error in the trial court's admission of the Ethel Avenue surveillance videos, we find no basis for the granting of a mistrial due to their admission. Harris also argues, alternatively, that the trial court should have granted a continuance to allow him an opportunity to access the tablet. Harris did not request a continuance, and with the record before us, we find no error in the trial court's failure to grant a continuance sua sponte.

{¶ 104} Harris's fourth assignment of error is overruled.

### IV. Sentencing

{¶ 105} In his first assignment of error, Harris asserts that the trial court's judgment entry does not accurately reflect the sentence orally imposed at the sentencing hearing. He asks that the matter be remanded for resentencing. The State agrees that the judgment entry does not reflect the 41 to 43½ years to life in prison that was imposed, but it asserts that the error many be corrected with a nunc pro tunc entry.

{¶ 106} It is well established that "a court speaks only through its journal entries, not through its oral pronouncements." *State v. Smith*, 2d Dist. Montgomery No. 26217, 2015-Ohio-700, ¶ 10. *See, also, e.g., State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776, ¶ 39, citing *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 15. In addition, a trial court lacks authority to reconsider its own valid final judgment in a criminal case. *E.g., State v. Raber*, 134 Ohio St.3d 350, 2012-Ohio-5636, 982 N.E.2d 684, ¶ 20; *State ex rel. Dobson v. Handwork*, 159 Ohio St.3d 442, 2020-Ohio-1069, 151 N.E.3d 613, ¶ 16.

{¶ 107} However, a nunc pro tunc entry is an appropriate vehicle for the trial court

to correct clerical or typographical errors in a judgment entry. *State v. Donley*, 2017-Ohio-562, 85 N.E.3d 324, ¶ 103 (2d Dist.), citing Crim.R. 36; *State v. Hibbler*, 2d Dist. Clark No. 2019-CA-19, 2019-Ohio-3689, ¶ 20. Accordingly, where a judgment entry does not accurately reflect the sentence imposed at a sentencing hearing, the judgment entry generally may be corrected by means of a nunc pro tunc entry. *State v. Pacific*, 2d Dist. Montgomery No. 28804, 2021-Ohio-973, ¶ 55.

{¶ 108} At sentencing, the trial court imposed two consecutive terms of 15 years to life in prison for the murders of McGee and Huntley (Counts 3 and 10), two consecutive three-year prison terms for the accompanying firearm specifications, and a consecutive indefinite term of five to seven and a half years in prison for aggravated burglary (Count 5). The trial court further imposed 36 months in prison for having weapons under disability (Count 17), to be served concurrently. The court ordered Harris to pay restitution of $500 to Ashley Brown, $525 to Brenda Allen, and $795 to Raquelle Johnson for funeral expenses, jointly and severally with his co-defendants. The court made additional findings and advisements as required by law and waived court costs and fees. Although the trial court initially misstated the maximum indefinite sentence, it concluded the sentencing hearing, saying, "The total sentence then is 41 to 43 and a half years to life," and it informed Harris of his right to appeal.

{¶ 109} The trial court's judgment entry accurately reflects the individual sentences imposed at the sentencing hearing. The entry indicates, however, that the aggregate sentence amounted to a minimum of 41 years to a maximum of 52½ years to life in prison. We further note that, contrary to the court's oral pronouncement, the entry does not clearly

indicate whether Count 17 (having weapons while under disability) and Count 5 (aggravated burglary) are to be served concurrently or consecutively. Because the judgment entry does not accurately reflect the sentence imposed at the dispositional hearing, the matter must be remanded for the purpose of issuing a nunc pro tunc entry that accurately reflects the aggregate sentence and that Counts 5 and 17 are to be served concurrently.

{¶ 110} Harris's first assignment of error is sustained.

### V. Conclusion

{¶ 111} The trial court's judgment will be affirmed. However, the trial court is instructed to file a nunc pro tunc entry, correcting its judgment entry so that it clearly reflects that Counts 5 (aggravated burglary) and 17 (having weapons while under disability) are to be served concurrently and that Harris's aggregate sentence is a minimum of 41 years to life to a maximum of 43½ years to life in prison.

. . . . . . . . . . . . .

WELBAUM, P.J. and LEWIS, J., concur.