[Cite as *State v. Hopkins*, 2025-Ohio-4681.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-59 |
| Appellee | : | |
| | : | Trial Court Case No. 23-CR-0845 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JONATHAN HOPKINS | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on October 10, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

ALANA VAN GUNDY, Attorney for Appellant
CHRISTOPHER P. LANESE, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Appellant Jonathan Hopkins appeals from his convictions for aggravated murder and having weapons while under disability following a jury trial in the Clark County Court of Common Pleas. In support of his appeal, Hopkins claims that his trial counsel provided ineffective assistance in multiple respects. Hopkins also claims that the trial court erred by denying his mid-trial requests to hire new counsel and continue his trial. For the reasons outlined below, we find that all of Hopkins's claims lack merit and affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On December 12, 2023, a Clark County grand jury returned a seven-count indictment charging Hopkins with two counts of felony murder and single counts of aggravated murder, murder, felonious assault, aggravated robbery, and having weapons while under disability. All charges, except the count of having weapons while under disability, included a firearm specification.

{¶ 3} The indicted charges and specifications stemmed from allegations that on the night of August 8, 2023, Hopkins shot and killed Michael Minter during an arranged meeting outside Minter's residence in Springfield, Ohio. It was alleged that Hopkins arranged to meet with Minter so that Hopkins could purchase some bullets from him. It was further alleged that, in addition to shooting Minter, Hopkins stole Minter's bullets and fled the scene in a car containing several people.

{¶ 4} On December 15, 2023, Hopkins appeared in court with his public defender and pled not guilty to the indicted charges. The same day, the public defender filed demands for a speedy trial, discovery, and a bill of particulars. Hopkins's motion to suppress followed on February 2, 2024, which sought to exclude evidence obtained from the execution of search warrants for certain Facebook and Google accounts. Hopkins argued that the search warrants were not supported by sufficient probable cause.

{¶ 5} The trial court held a hearing on Hopkins's motion to suppress on March 4, 2024, and overruled it on March 6, 2024. While the trial court's decision on the motion to suppress was pending, Hopkins's public defender filed a motion requesting funds to hire a firearms and ballistics expert. The trial court granted the motion on February 13, 2024. On April 25, 2024, Hopkins filed a notice of substitution indicating that he had retained new counsel.

{¶ 6} After two agreed trial continuances, Hopkins's case proceeded to a three-day jury trial beginning on September 23, 2024. The State called several witnesses, including Minter's fiancée, the mother of his children. Minter's fiancée testified that she had known Hopkins for a few years and that Hopkins was Minter's "associate." Trial Tr. 118. Minter's fiancée recalled that on the night of Minter's death, he was at home on his cell phone text messaging with Hopkins just before Minter told her that he was going outside "to take care of something." Trial Tr. 110.

{¶ 7} As Minter was going outside, Minter's fiancée saw that Minter had taken a baggie of bullets with him. Minter's fiancée recounted that Minter had told her that he would be coming back and that he loved her. Minter closed the door and went out to their front porch. About two to five minutes later, Minter's fiancée heard a "whole bunch of shots." Trial Tr. 112.

3

{¶ 8} After hearing shots, Minter's fiancée ran to the front door and tried to call Minter's cell phone. She heard the phone ring but did not see Minter anywhere. She then noticed that everything on their front porch had been knocked over. She also viewed a car parked directly in front of their residence. Once she noticed the car, Minter's fiancée saw Hopkins get inside the car holding what appeared to be a gun.

{¶ 9} Minter's fiancée indicated that she and Hopkins made eye contact and that Hopkins "looked dead at me before he got in the car and said 'pull off'" to the other people in the vehicle. Trial Tr. 114. Minter's fiancée witnessed three other people in the car with Hopkins, and once Hopkins got inside, the car pulled away. Minter's fiancée was interviewed by the police on the night of the shooting, at which time she reported seeing Hopkins flee the scene in a car. The day after the shooting, Minter's fiancée identified Hopkins in a photo lineup.

{¶ 10} Minter's fiancée explained that when she saw Hopkins running toward the car, he was coming from the area where she eventually found Minter—lying in a neighbor's driveway. When she found Minter, she grabbed his hand and attempted to get him to talk to her, but he would not respond. Minter was just lying there with his eyes rolled in the back of his head. Medics arrived at the scene and attempted to save Minter's life, but he succumbed to his injuries and died at the hospital. The coroner testified that Minter's cause of death was multiple gunshot wounds.

{¶ 11} Minter's fiancée recalled that when she found Minter, he no longer had the bag of bullets that he had taken with him. The authorities did, however, find a bag of cocaine near Minter's body.

{¶ 12} Minter's fiancée added that on the night of the shooting, she found Minter's cell phone in their yard and picked it up. Minter's fiancée did not immediately turn Minter's

4

phone over to the police because she feared, from past experience, that she would not get the phone back and would lose all the family pictures stored on the device. One of the investigating detectives, Detective Kevin Miller, testified that Minter's fiancée provided Minter's phone to law enforcement when it was requested from her after an unspecified period of time. Miller ran Cellebrite reports on Minter's phone and confirmed that on the night of the shooting, Minter had been texting with Hopkins and that Minter and Hopkins had arranged to meet so that Hopkins could purchase bullets in exchange for cocaine.

{¶ 13} Additionally, the State presented video evidence, which showed Hopkins in a car with multiple people at a local Mini Mart and Speedway gas station shortly before the shooting. One of the videos showed Hopkins inside the Mini Mart with what appeared to be a firearm near the waistband of his pants. During his testimony, Miller explained that in the video, he first saw "something sticking out of either [Hopkins's] waistband or his pocket" and then noticed "a change in silhouette amongst his body," which he found "consistent with the handle of a firearm." Trial Tr. 387-389.

{¶ 14} Miller said that he was "looking for what's called printing which is where a firearm's silhouette is pressing through a person's clothing." Trial Tr. 389. Miller indicated that in the video "there is a slight discoloration to the pant pocket" and that he could "make out the printing, shape, and the actual shape of the firearm in his pocket." Trial Tr. 391. After noticing that Hopkins had engaged in a common "grooming technique" of adjusting his pants due to the weight of the firearm and had performed "security touch to the firearm" to resecure and confirm it was still there, Miller was "firmly convinced that it [was] a firearm in [Hopkins's] pocket after watching the video . . . ." Trial Tr. 392.

{¶ 15} The State also presented evidence from a firearms and ballistics expert who determined that shell casings found at the scene of the shooting were shot from two different

5

firearms—a Canik pistol and Glock pistol. The expert testified that two of the shell casings were fired from the Canik and that ten of the shell casings and six bullets recovered from Minter were fired from the Glock. Although the trial court had granted funds for the defense to hire its own firearms and ballistics expert, Hopkins's trial counsel did not hire such an expert and simply cross-examined the State's expert.

{¶ 16} Detective Miller testified that the Canik pistol was recovered from Jeffrey Sharp in a separate investigation. During an interview with Miller, Hopkins admitted that he had sold the Canik to Sharp. Hopkins's Facebook account established that he had placed a Canik pistol up for sale the same day that Minter was murdered, as well as a week later on August 15, 2023. Miller stated that the Canik appeared to be the same firearm that was in Hopkins's pants pocket in the Mini Mart video. Miller also testified that the Glock appeared to be the same firearm that one of Hopkins's counterparts was carrying in the video.

{¶ 17} On the third day of trial, after the State had already rested its case, Hopkins told the trial court that he wanted new counsel. Hopkins asserted that his counsel had not requested a continuance at the beginning of trial based on the State's late disclosure of autopsy photographs. Hopkins told the trial court that he believed his counsel had lied to him about requesting the continuance and that he "[didn't] feel like [he was] being represented like [he was] supposed to." Trial Tr. 498.

{¶ 18} Following Hopkins's request, defense counsel and the trial court explained what had transpired and indicated that defense counsel had raised the issue of the State's late disclosure of the autopsy photographs and that the trial court had decided to rule on the issue at a later time. The trial court denied Hopkins's request for new counsel and declined to continue trial. Hopkins then testified in his defense where he denied shooting Minter and stealing the bullets from him. According to Hopkins, the exchange with Minter took place

6

without incident. Hopkins testified that just after he left Minter's residence, he heard some gunshots but did not think anything of it because it was "Queen Muffy Day"—a "holiday" where guns are fired in honor of a deceased local woman, Queen Muffy. Trial Tr. 533-534.

{¶ 19} Hopkins maintained that the item Detective Miller saw in his pants pocket in the Mini Mart video was not a firearm but an iPhone with a "clip-on holder." Trial Tr. 570. Hopkins further claimed that Minter was his friend and that he had no quarrel with him. Hopkins presented testimony from his fiancée who confirmed that he and Minter were friends and not just associates as claimed by Minter's fiancée.

{¶ 20} The jury found Hopkins guilty as charged in the indictment. At sentencing, the trial court merged all the charges, except for the charge of having weapons while under disability. The State elected to have Hopkins sentenced for aggravated murder, for which the trial court sentenced Hopkins to life in prison without the possibility of parole. The trial court further sentenced Hopkins to 3 years in prison for the related firearm specification, as well as 36 months in prison for having weapons while under disability. The trial court ordered the 36-month prison term to run concurrently with Hopkins's life sentence.

{¶ 21} Hopkins now appeals from his convictions and raises eleven assignments of error for review.

**Ineffective Assistance of Counsel**

{¶ 22} The first nine assignments of error raised by Hopkins are ineffective assistance of counsel claims. To prevail on an ineffective assistance claim, Hopkins must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. The

7

failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 23} To establish deficient performance, the appellant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland*.

{¶ 24} To establish prejudice, the appellant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694.

{¶ 25} When reviewing ineffective assistance claims, we will not second-guess trial strategy decisions. *State v. Mason*, 82 Ohio St.3d 144, 157 (1998); *Strickland*, 466 U.S. at 689. It is well established that "'trial counsel is allowed wide latitude in formulating trial strategy.'" *State v. Collins*, 2011-Ohio-4475, ¶ 15 (2d Dist.), quoting *State v. Olsen*, 2011-Ohio-3420, ¶ 121 (2d Dist.). Therefore, "[d]ebatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992).

8

**First Assignment of Error**

{¶ 26} Under his first assignment of error, Hopkins claims that his trial counsel provided ineffective assistance by failing to file a motion to suppress the evidence that was obtained from Minter's cell phone. Hopkins asserts that this evidence should have been suppressed due to possible tampering by Minter's fiancée, who kept the phone in her possession for an unspecified period before turning it over to the police. Hopkins claims that this caused a defect in the chain of custody that prevented proper authentication of the evidence. As a result, Hopkins asserts that admission of the evidence from Minter's cell phone prejudiced him and violated Evid. R. 901(A), which "requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2011-Ohio-2068, ¶ 12 (2d Dist.).

{¶ 27} As a preliminary matter, "[f]ailing to file a motion to suppress does not constitute ineffective assistance of counsel per se." (Citations omitted.) *State v. Brown*, 2007-Ohio-4837, ¶ 65. "'It is only considered ineffective assistance of counsel when the record demonstrates the motion to suppress would have been successful if made.'" *State v. Sitzes*, 2023-Ohio-3915, ¶ 24 (2d Dist.), quoting *State v. Black*, 2016-Ohio-7901, ¶ 26 (2d Dist.). Therefore, "[w]here the basis of an ineffective assistance of counsel claim is counsel's failure to file a motion to suppress evidence, the defendant making that claim must prove that the basis of the suggested suppression claim is meritorious." (Citations omitted.) *In re D.D.*, 2009-Ohio-808, ¶ 3 (2d Dist.).

{¶ 28} We find that a motion to suppress the evidence from Minter's cell phone based on an alleged violation of Evid.R. 901(A) would not have been successful because a motion to suppress is not the proper vehicle to challenge the authenticity of the evidence. *See State v. Wolfe*, 2025-Ohio-866, ¶ 93-97 (2d Dist.) (sustaining trial court's decision that overruled

9

a motion to suppress challenging the authenticity of videotape evidence because a motion to suppress was not the proper vehicle to challenge the authenticity of the evidence). "Generally, motions to suppress are used to raise challenges to evidence that is alleged to have been obtained in violation of the Constitution, while motions in limine are used to raise challenges to evidence based on the Rules of Evidence." *State v. Hubbs*, 2010-Ohio-4849, ¶ 15 (7th Dist.), citing *State v. Edwards*, 2005-Ohio-6180, ¶ 16 and *State v. French*, 72 Ohio St.3d 446, 449 (1995).

{¶ 29} This court has explained:

"A 'motion to suppress' is defined as a '[d]evice used to eliminate from the trial of a criminal case evidence which has been secured illegally, generally in violation of the Fourth Amendment (search and seizure), the Fifth Amendment (privilege against self incrimination), or the Sixth Amendment (right to assistance of counsel, right of confrontation etc.), of U.S. Constitution.'" [*French* at 449,] quoting *Black's Law Dictionary* (6 Ed. 1990). Thus, a motion to suppress is the proper vehicle for raising constitutional challenges based on the exclusionary rule first enunciated by the United States Supreme Court in *Weeks v. United States*, 232 U.S. 383 (1914), and made applicable to the states in *Mapp v. Ohio*, 367 U.S. 643 (1961). *French* at 449.

*Wolfe* at ¶ 95.

{¶ 30} Because Hopkins's suppression argument is not based on any of these principles but rather on the alleged inauthenticity of the evidence, a motion to suppress raising such an argument would have been inappropriate and would have failed. Hopkins's counsel consequently did not perform deficiently by failing to file such a motion to suppress.

10

The ineffective assistance of counsel claim raised under Hopkins's first assignment of error lacks merit.

{¶ 31} We note that a motion in limine would have been the appropriate way for Hopkins's counsel to have challenged the authenticity of the evidence obtained from the victim's cell phone. Although not argued by Hopkins, we find that he cannot demonstrate that his counsel was ineffective by failing to file a motion in limine or that he was prejudiced by such failure. The record establishes that Minter's cell phone was properly authenticated by Minter's fiancée, and no evidence established that Minter's fiancée had tampered with any messages on the phone. Minter's fiancée testified that she did not immediately turn the phone over to police after the shooting because, from experience, she had feared that the phone would never be returned and that she would lose all the family photographs stored on the device. The record also establishes that Minter's fiancée cooperated with the police and turned over the phone when it was eventually requested. There is absolutely nothing in the record indicating that Minter's fiancée did anything with the phone other than ensure her family's photographs were safe. If the authenticity and tampering issues had been raised, the State would have likely presented phone records to confirm that the messages between Minter and Hopkins had not been altered. Even if counsel had moved in limine to exclude the evidence from Minter's cell phone, it is likely that the motion would have been overruled.

{¶ 32} Hopkins's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 33} Under his second assignment of error, Hopkins claims that his trial counsel provided ineffective assistance by failing to subpoena Minter's cell phone records. Hopkins claims that Minter's cell phone records could have potentially refuted the State's testimony

11

indicating that he was the last person to contact Minter. Hopkins argues the records could have also revealed whether any messages were deleted.

{¶ 34} The decision whether to subpoena Minter's cell phone records was within the purview of trial strategy and therefore cannot form the basis of an ineffective assistance of counsel claim. *State v. Woodard*, 2022-Ohio-3081, ¶ 73 (2d Dist.) (failing to subpoena cell records did not amount to ineffective assistance of counsel because such a decision is a matter of trial strategy), citing *State v. Bennett*, 2008-Ohio-5812, ¶ 11 (6th Dist.) ("[d]iscovery decisions are presumed to be trial strategies which do not constitute ineffective assistance of counsel") and *State v. McCoy*, 2010-Ohio-2639, ¶ 51 (2d Dist.) ("counsel's failure to subpoena tapes would have been a matter of trial strategy") (additional citations omitted).

{¶ 35} In this case, Hopkins's trial counsel may have chosen not to subpoena Minter's cell phone records out of concern the effort would have been futile, as the records may have favored the State's case against Hopkins. Because even a debatable decision concerning trial strategy cannot form the basis of a claim for ineffective assistance of counsel, Hopkins's claim that his trial counsel provided ineffective assistance by failing to subpoena Minter's cell phone records lacks merit. *Conley*, 2015-Ohio-2553 at ¶ 56 (2d Dist.).

{¶ 36} Hopkins's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 37} Under his third assignment of error, Hopkins claims that his trial counsel was ineffective by failing to obtain a firearms and ballistics expert to challenge the testing and analysis that was performed by the State's expert. Hopkins claims this failure was especially egregious since the trial court approved funds for his trial counsel to hire such an expert. We disagree.

**{¶ 38}** "'[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *State v. Hartman*, 93 Ohio St.3d 274, 299 (2001), quoting *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993). "In fact, in many criminal cases trial counsel's decision not to seek expert testimony 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.'" *State v. Samatar*, 2003-Ohio-1639, ¶ 90 (10th Dist.), quoting *State v. Glover*, 2002-Ohio-6392, ¶ 25 (12th Dist.); *accord State v. Jackson*, 2003-Ohio-6183, ¶ 76 (10th Dist.). Again, "'even if the wisdom of such an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel.'" *Samatar* at ¶ 90, quoting *Glover* at ¶ 25, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

**{¶ 39}** As a further matter, it is well established that "in direct appeals appellate courts do not consider claims that rest on matters outside the record." *State v. Carver*, 2022-Ohio-2653, ¶ 28 (4th Dist.). Therefore, if demonstrating ineffective assistance of counsel requires proof outside the record, then such claim is not properly raised in a direct appeal. *State v. White*, 2018-Ohio-3076, ¶ 71 (2d Dist.) ("[a] claim of ineffective assistance of counsel cannot be asserted on direct appeal if it relies on matters outside the record"), citing *State v. Harris*, 2017-Ohio-9052, ¶ 19 (2d Dist.).

**{¶ 40}** To succeed in his ineffective assistance claim, Hopkins must establish that he was prejudiced by his counsel's failure to call a firearms and ballistics expert, i.e., that there was a reasonable probability that the expert's testimony would have changed the outcome of his trial. This requires proof outside the record, such as affidavits demonstrating the expert's probable testimony. *State v. Madrigal*, 87 Ohio St.3d 378, 391 (2000). Without such proof, Hopkins's ineffective assistance claim is based on pure speculation, and speculation

is insufficient to establish ineffective assistance of counsel. *Id*.; *State v. Short*, 2011-Ohio-3641, ¶ 119; *State v. Perez*, 2009-Ohio-6179, ¶ 217.

{¶ 41} The decision to hire a firearms and ballistics expert was within the purview of trial strategy. Considering the absence of anything in the record indicating the content of such an expert's testimony, resolving whether the testimony would have favored Hopkins's case is purely speculative. Hopkins cannot establish that his trial counsel provided ineffective assistance by failing to hire a firearms and ballistics expert to testify at trial.

{¶ 42} Hopkins's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 43} Under his fourth assignment of error, Hopkins claims that his trial counsel was ineffective for failing to: (1) hire an expert witness in the field of eyewitness identification to challenge the validity of the identification of him by Minter's fiancée; and (2) adequately cross-examine the witnesses who testified regarding how the photo lineup was administered to Minter's fiancée.

{¶ 44} In support of this claim that his counsel was ineffective for failing to hire an eyewitness expert, Hopkins relies on the Supreme Court of Ohio's decision in *State v. Bunch*, 2022-Ohio-4723. Hopkins suggests that *Bunch* stands for the proposition that a trial counsel's failure to utilize an expert witness to explain the science and psychology behind eyewitness identification can constitute deficient performance and render the use of the photo lineup identification prejudicial for the purpose of an ineffective assistance claim.

{¶ 45} Hopkins's reliance on *Bunch* is misplaced. In *Bunch*, the defendant filed a petition for postconviction relief in which he asserted that his trial counsel had been ineffective for failing to present expert testimony to help the jury understand the unreliability of eyewitness identification, particularly under the circumstances in which the defendant was

14

identified by the victim. *Id.* at ¶ 2. The victim had been kidnapped from the street and repeatedly raped by a group of strangers. *Id*. at ¶ 4. When the victim reviewed a photo lineup that included the defendant's picture, the victim stated that the photo of the defendant "might be the fourth attacker, but she was not sure." *Id* at ¶ 6. It was not until the victim saw a picture of the defendant in the newspaper identifying him as a suspect that the victim was certain that the defendant was the fourth attacker. *Id*.

{¶ 46} To support his ineffective-assistance claim, the defendant in *Bunch* attached an affidavit from an expert in the field of eyewitness identification to his petition for postconviction relief. *Id*. at ¶ 14. The expert averred that the victim's identification of the appellant was likely inaccurate. The expert explained that the victim's inability to provide a confident identification of the fourth perpetrator rendered her choice more likely to be inaccurate and that her later identification of the appellant was likely a product of suggestion and inference, and thus more prejudicial than probative. *Id*.

{¶ 47} Despite the information in the expert's affidavit, the trial court rejected the appellant's ineffective assistance claim and denied his petition for postconviction relief without holding a hearing, and the Seventh District Court of Appeals affirmed. *Bunch*, 2022-Ohio-4723, at ¶ 2. Both courts relied on the principle that an attorney's failure to use an expert witness and instead rely on cross-examination was a matter of trial strategy and did not constitute ineffective assistance of counsel as a matter of law. *Id*. at ¶ 17-19.

{¶ 48} The Supreme Court of Ohio faulted the lower courts' failure "to apply the proper standard for reviewing whether a hearing was required on [the defendant's] post-conviction ineffective assistance claim and . . . [treatment of the claim] as one on the merits in a direct appeal." *Id.* at ¶ 29. The courts had incorrectly held the defendant to "the standard of proving

that 'the outcome of the proceedings would have been different but for counsel's deficient performance.'" *Id*. at ¶ 28, quoting *State v. Bunch*, 2021-Ohio-1244, ¶ 23 (7th Dist.).

{¶ 49} The Supreme Court faulted the lower courts' reliance on the standard articulated in *Nicholas* that "'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *Id.* at ¶ 36, quoting *Nicholas*, 66 Ohio St.3d at 436. The Court explained that *Nicholas* involved a direct appeal, which the court had "repeatedly held" is "not the appropriate place to consider allegations of ineffective assistance of trial counsel that turn on information that is outside the record." *Id.* at ¶ 35. The court stressed that "[b]ecause we cannot consider information outside the record in a direct appeal, we must often conclude that a defendant's claims are speculative. . . . And speculation alone cannot overcome 'the "strong presumption" that counsel's performance constituted reasonable assistance.'" *Id.*, quoting *State v. Foust*, 2004-Ohio-7006, ¶ 89, quoting *Bradley*, 42 Ohio St.3d at 144.

{¶ 50} The Supreme Court explained the difference between direct appeals and postconviction cases:

Our holding in *Nicholas* and its ilk, though broadly worded, is not applicable to postconviction claims of ineffective assistance of counsel, where courts have the ability to consider evidence outside the record and are not limited to mere speculation. In the present context of postconviction litigation, it is possible and appropriate to question whether a trial counsel's decisions were in fact deliberate and strategic and whether strategic decisions were reasonable ones. Trial strategy is usually within the "wide range of reasonable professional assistance," [*Strickland*, 466 U.S. at 689], but strategy is not synonymous with reasonableness.

16

*Bunch,* 2022-Ohio-4723, at ¶ 36.

{¶ 51} The Supreme Court ultimately concluded in *Bunch* that an evidentiary hearing was necessary to reach the merits regarding whether the appellant's trial counsel performed deficiently by failing to call an eyewitness identification expert at trial and that the trial court erred by failing to hold such a hearing. *Id.* at ¶ 48-52. The Supreme Court stressed that its decision was not focused on the merits of the appellant's ineffective assistance claim, but rather the adequacy of the process leading up to a decision on that claim. *Id*. at ¶ 51. Hopkins incorrectly relies on *Bunch* for the proposition that the failure to call an eyewitness identification expert amounts to ineffective assistance of counsel, as that was not the holding of the case.

{¶ 52} *Bunch* is further distinguishable from the present case because it involved a postconviction claim as opposed to a direct appeal. In direct appeals, it is appropriate to apply the standard in *Nicholas* that "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *Nicholas* 66 Ohio St.3d at 436. Indeed, it was within the purview of trial strategy for Hopkins's trial counsel to have simply cross-examined the eyewitness and foregone calling an expert in the field of eyewitness identification. As previously discussed, "trial counsel is allowed wide latitude in formulating trial strategy." *State v. Olsen*, 2011-Ohio-3420, ¶ 121 (2d Dist.).

{¶ 53} Unlike the eyewitness in *Bunch*, who was repeatedly raped by a group of strangers and initially unsure whether the appellant was one of the assailants, the eyewitness in this case, Minter's fiancée, was familiar with Hopkins before the shooting and confidently recognized him as the person she saw fleeing from the area where the Minter's body was found. Minter's fiancée not only identified Hopkins during a photo lineup but also identified him during an interview with the police shortly after the shooting. Hopkins's counsel

17

could have reasonably believed that it would have been a waste of time to hire an eyewitness identification expert to challenge the identification of Hopkins by Minter's fiancée. We are not at liberty to second-guess that decision. *State v. Blanton*, 2023-Ohio-89, ¶ 59 ("[i]n reviewing ineffective assistance claims, we will not second-guess trial strategy decisions"), citing *Mason*, 82 OhioSt.3d at 157.

**{¶ 54}** Additionally, Hopkins's claim relies on matters outside the record that this court cannot consider on direct appeal. *See Madrigal*, 87 Ohio St.3d at 391. To succeed in his ineffective assistance claim, Hopkins must establish that an eyewitness identification expert's testimony would have changed the outcome of his trial. This requires proof of what the expert would have testified to, which is not part of the appellate record. Therefore, Hopkins's ineffective assistance claim is based on pure speculation, and speculation is insufficient to establish ineffective assistance of counsel. *Id.*; *Short*, 2011-Ohio-3641 at ¶ 119; *Perez*, 2009-Ohio-6179 at ¶ 217. For the foregoing reasons, Hopkins's claim that his counsel was ineffective for failing to call an expert in the field of eyewitness identification lacks merit.

**{¶ 55}** Hopkins's claim that his counsel was ineffective for failing to adequately cross-examine the witnesses who testified regarding how the photo lineup was administered also lacks merit. "We have held that 'trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters.'" *State v. Watters*, 2016-Ohio-8083, ¶ 29 (2d Dist.), quoting *State v. Russell*, 2007-Ohio-137, ¶ 55 (2d Dist.). As previously discussed, "[a] reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *Conley*, 2015-Ohio-2553 at ¶ 56 (2d Dist.), citing *State v. Smith*, 17 Ohio St.3d 98 (1985). We have reviewed the record and find nothing to indicate that Hopkins's trial counsel was ineffective in how he cross-examined the witnesses who

18

testified regarding the photo lineup. This portion of Hopkins's ineffective assistance claim fails as well.

{¶ 56} Hopkins's fourth assignment of error is overruled.

**Fifth Assignment of Error**

{¶ 57} Under his fifth assignment of error, Hopkins claims that his trial counsel was ineffective for failing to subpoena the multiple witnesses who were with him on the evening of the murder. Hopkins takes issue with his trial counsel failing to subpoena an individual known as Honcho, a.k.a. Dontesz Brandon, who allegedly made a Facebook post in which he took credit for killing the victim.

{¶ 58} As a preliminary matter, we note that the video evidence from Mini Mart and Speedway and Hopkins's own trial testimony established that Hopkins was with several people on the evening of the shooting, one of whom was Brandon. The evidence also established that there were two different firearms used during the shooting and that Brandon was seen in the Mini Mart video carrying what appeared to be one of those firearms, the Glock. Minter's fiancée saw three other people in the vehicle that Hopkins entered when he fled from the area where Minter's body was discovered. Given this evidence, it is entirely possible that more than one person was involved in the shooting, possibly explaining why Brandon took credit for killing Minter.

{¶ 59} That said, the failure to call or subpoena witnesses falls within the purview of trial strategy and therefore cannot form the basis of an ineffective assistance claim. *State v. Conway*, 2006-Ohio-2815, ¶ 113 ("[c]ounsel's decision to call a witness is a matter of trial strategy"); *State v. Treesh*, 90 Ohio St.3d 460, 489 (2001) ("counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court"). As we have emphasized, even a debatable decision concerning trial

19

strategy cannot establish ineffective assistance of counsel. *Conley,* 2015-Ohio-2553 at ¶ 56 (2d Dist.).

{¶ 60} In this case, it is unknown from the record whether Hopkins provided his counsel the necessary information to subpoena Brandon or any of the other people he had contact with on the night of the shooting or whether Hopkins even wanted counsel to call those individuals as witnesses at the trial. It is entirely possible that Hopkins wanted to protect the other people who were with him or that his counsel specifically chose not to call those individuals because of a legitimate concern that they might point the finger at Hopkins. Alternatively, Hopkins's counsel may have simply determined that the potential witnesses lacked credibility and would not have assisted the defense. Because choosing not to call the multiple people that Hopkins had contact with on the night of the shooting could have been a strategic decision, such a decision does not amount to deficient performance and cannot support an ineffective assistance claim.

{¶ 61} Even if Hopkins could demonstrate that his trial counsel performed deficiently by failing to identify and subpoena these putative witnesses, a determination of Hopkins's claim of ineffective assistance of counsel would again require evidence outside the record to establish that counsel's inaction prejudiced him. *See State v. Hillman*, 2014-Ohio-5760, ¶ 57 (10th Dist.); *Madrigal*, 87 Ohio St.3d at 391. The record does not provide any indication as to what the potential witnesses' testimony would have been; therefore, the nature of the potential testimony and the effect it would have had on Hopkins's trial is purely speculative. Speculation is insufficient to establish ineffective assistance of counsel. *Short*, 2011-Ohio-3641 at ¶ 119; *Perez*, 2009-Ohio-6179 at ¶ 217.

{¶ 62} Hopkins's fifth assignment of error is overruled.

**Sixth Assignment of Error**

{¶ 63} Under Hopkins's sixth assignment of error, he claims that his trial counsel provided ineffective assistance by failing to object to the State's indication that he was under a weapons disability without presenting evidence of such a disability. Upon review, we find that Hopkins's claim is belied by the record.

{¶ 64} As a preliminary matter, Hopkins was charged and convicted of having weapons while under disability in violation of R.C. 2923.13(A)(4). The statute provides: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry or use any firearm or dangerous ordnance, if . . . [t]he person has a drug dependency, is in danger of drug dependence, or has chronic alcoholism." R.C. 2923.13(A)(4).

{¶ 65} "'Person with a drug dependency' means any person who, by reason of the use of any drug of abuse, is physically, psychologically, or physically and psychologically dependent upon the use of such drug, to the detriment of the person's health or welfare." R.C. 3719.011(B). "'Person in danger of becoming a person with a drug dependency' means any person who, by reason of the person's habitual or incontinent use of any drug of abuse, is in imminent danger of becoming a person with a drug dependency." R.C. 3719.011(C).

{¶ 66} We disagree with Hopkins's claim that no evidence was presented at trial establishing that he was under a weapons disability. Detective Miller testified that during his interview with Hopkins, Hopkins admitted to using cocaine, being a "habitual drug user," and selling drugs. Trial Tr. 465-466. Miller specifically indicated that as a habitual drug user, Hopkins was not legally able to own weapons in the state of Ohio. Trial Tr. 456.

{¶ 67} Hopkins himself testified that "off and on throughout the years, [he] had a drug habit, cocaine." Trial Tr. 522. Hopkins admitted that he had used cocaine with the victim "a

21

lot of times." Trial Tr. 523. Hopkins said that he did not remember certain events during the evening of the murder and had lied during his interview with Miller due to drug and alcohol use. *Id*. at 539, 603, 606, 614.

{¶ 68} Based on this testimony, we reject Hopkins's claim that no evidence was presented at trial establishing that he was under a weapons disability. This court has previously found similar evidence sufficient to establish that a defendant was a drug dependent person or was in danger of becoming drug dependent person for purposes of committing the offense of having weapons while under disability in violation of R.C. 2923.13(A)(4). *See, e.g., State v. Gex*, 2011-Ohio-631, ¶ 37-38 (2d Dist.) (evidence established that the defendant admitted to a detective that he was addicted to marijuana, was growing it in his home, and that "he smokes weed every day and that he's been doing it since he was a kid").

{¶ 69} Contrary to Hopkins's claim otherwise, his trial counsel did attempt to refute the claim that he was under a weapons disability. During closing argument, Hopkins's trial counsel argued that the evidence presented at trial did not support finding him guilty of having weapons while under disability because there was "no testimony from anybody that said he has been diagnosed as a drug addict or has a conviction of a drug charge." Trial Tr. 676.

{¶ 70} Because evidence in the record established that Hopkins was under a weapons disability pursuant to R.C. 2923.13(A)(4) and because Hopkins's counsel did attempt to address the issue during closing argument, we find that the ineffective assistance claim raised under Hopkins's sixth assignment of error lacks merit.

{¶ 71} Hopkins's sixth assignment of error is overruled.

**Seventh Assignment of Error**

{¶ 72} Under his seventh assignment of error, Hopkins claims that his trial counsel was ineffective by failing to file a motion in limine to prohibit Curtis Gifford from testifying at trial. Gifford testified that three months after Minter was murdered, Hopkins robbed him of a firearm at gunpoint. Gifford stated that as Hopkins held him at gun point, he showed him a video of a news clip that reported Minter's murder. *See* State's Ex. 130. Hopkins then told Gifford that he was the person who killed Minter and that "if you make the wrong move or you call anybody when I leave, then you can be like this." Trial Tr. 363. In other words, the testimony recounting Hopkins's threat revealed his intimidation of Gifford during the uncharged robbery and inculpated him in Minter's death. Hopkins claims that his trial counsel should have filed a motion in limine to exclude this testimony because "presenting uncharged conduct at trial is prejudicial."

{¶ 73} "'A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime.'" *State v. Sutherland*, 2021-Ohio-2433, ¶ 8 (2d Dist.), quoting *State v. Curry*, 43 Ohio St.2d 66, 68 (1975). "Evid.R. 404 is the embodiment of that principle." *Id*.

{¶ 74} Pursuant to Evid.R. 404(B)(1): "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Nonetheless, such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity

23

to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 2020-Ohio-4440, ¶ 22.

{¶ 75} The proponent of 404(B)(2) evidence must:

(a) provide reasonable notice of any such evidence the proponent intends to introduce at trial so that an opposing party may have a fair opportunity to meet it;

(b) articulate in the notice the permitted purpose for which the proponent intends to offer the evidence, and the reasoning that supports the purpose; and

(c) do so in writing in advance of trial, or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Evid.R. 404(B)(2)(a)-(c).

{¶ 76} The record in this case establishes that the State filed a written "Notice Pursuant to 404(B)" prior to trial indicating that it planned to introduce evidence of a prior crime, wrong, or act by Hopkins—the robbery of Gifford. The notice explained the nature of the evidence and how it would be presented to show Hopkins's admission to killing Minter during his robbery of Gifford, a permissible use under Evid.R. 404(B)(2).

{¶ 77} Gifford's testimony was not presented to prove Hopkins's character or propensity to commit criminal acts, and the State followed the correct procedure under Evid.R. 404(B) for presenting this evidence. Hopkins's trial counsel lacked a basis to move to exclude Gifford's testimony. We do not find that Hopkins's counsel performed deficiently by failing to file a baseless motion in limine. Because there was no deficient performance by

24

Hopkins's trial counsel in relation to this issue, this ineffective assistance claim necessarily fails.

{¶ 78} Hopkins's seventh assignment of error is overruled.

**Eighth Assignment of Error**

{¶ 79} Under his eighth assignment of error, Hopkins claims that his trial counsel provided ineffective assistance by failing to object to Detective Miller giving unqualified expert testimony about "printing," which Hopkins claims is a pseudoscience that does not exist. Miller testified that "printing" is when "a firearm's silhouette is pressing through a person's clothing." Trial Tr. 389. What Hopkins calls pseudoscience was simply Miller's observation in the Mini Mart video of what appeared to be the silhouette of a gun in Hopkins's pants pocket.

{¶ 80} Under Evid.R. 701, lay witnesses may give opinion testimony when it is: "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. "'It is well-settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony pursuant to Evid.R. 701.'" *State v. Jones*, 2015-Ohio-4116, ¶ 108 (2d Dist.), quoting *State v. Tatum*, 2011-Ohio-907, ¶ 17 (10th Dist.). In other words, "police officers may offer lay opinion testimony under Evid.R. 701 if it is based on the officers' perceptions through experience." (Citations omitted.) *State v. Lavender*, 2019-Ohio-5352, ¶ 96 (1st Dist.). For example, in *State v. Renner*, 2013-Ohio-5463 (2d Dist.), this court held that an officer's testimony that injuries to a domestic violence victim were defensive wounds was admissible lay witness testimony considering its basis in the officer's personal observation of the victim, training as

25

a police officer regarding defensive wounds, and common understanding of how bruises, abrasions, and rashes appear. *Id*. at ¶ 76-77.

{¶ 81} Miller's testimony indicated that he had been a police officer for nine years and that he had received training on how to identify whether someone is carrying a firearm on their person. He testified that, as part of his training, he looked for "printing" and explained what printing was. Miller described how he observed printing in the video evidence to help the jury understand why he believed Hopkins was carrying a firearm. Contrary to Hopkins's claim otherwise, Miller did not have to be qualified as an expert to give this opinion because it was based on his personal observations of the video and his experience as a police officer. *See State v. Stout*, 42 Ohio App.3d 38, 42 (12th Dist. 1987) (police officer could give a lay opinion that a stain depicted in a photograph appeared to be blood where the opinion was based upon the officer's perception and was helpful to a determination of a fact); *State v. Norman*, 7 Ohio App.3d 17, 18-19 (5th Dist. 1982) (police officer could give lay opinion as to shot pattern made by a shotgun where the opinion was based upon the officer's experience and observation and aided the trier of fact); *see also State v. Platt*, 2024-Ohio-1330, ¶ 78-81 (4th Dist.) (police chief's testimony about home gun-safety and gun-storage practices admissible as lay opinion because it was rationally related to his perceptions and based on his everyday experience as a law enforcement officer and gun owner).

{¶ 82} Because Miller was permitted to give the testimony at issue, we cannot say that Hopkins's counsel performed deficiently by failing to object to it at trial. We also fail to see how the testimony prejudiced Hopkins, as the jurors were given the opportunity to view the video and were free to decide whether they believed the item in the pocket of Hopkins's pants looked like a gun.

{¶ 83} Hopkins's eighth assignment of error is overruled.

26

**Ninth Assignment of Error**

{¶ 84} Under his ninth assignment of error, Hopkins claims that his trial counsel was ineffective by failing to file a motion to dismiss his case on statutory speedy-trial grounds. We disagree.

{¶ 85} The Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article 1 of the Ohio Constitution guarantee a criminal defendant the right to a speedy trial by the state. *State v. O'Brien*, 34 Ohio St.3d 7, 8 (1987). The constitutional right to a speedy trial is statutorily enforced in Ohio by the provisions of R.C. 2945.71 et seq. *State v. Adams*, 43 Ohio St.3d 67, 68 (1989). Pursuant to R.C. 2945.71, a person charged with a felony offense "shall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). However, "[e]ach day the accused is held in jail in lieu of bail is counted as three days." *State v. Harris*, 2023-Ohio-648, ¶ 12 (2d Dist.), citing R.C. 2945.71(E). As a result, if the accused is incarcerated the entire time preceding trial, the time limit for bringing the accused to trial is reduced to 90 days. *State v. Dankworth*, 2007-Ohio-2588, ¶ 31 (2d Dist.).

{¶ 86} "A defendant establishes a prima facie speedy trial violation when his motion [to dismiss] reveals that a trial did not occur within the time period prescribed by R.C. 2945.71." *State v. Hill*, 2020-Ohio-2958, ¶ 6 (2d Dist.), citing *State v. Butcher*, 27 Ohio St.3d 28, 31 (1986). "If a defendant 'establishes a prima facie case of a violation of his right to a speedy trial, the burden then shifts to the State' to demonstrate either that the statutory limit was not exceeded, or that the State's time to bring the defendant to trial was properly extended." *State v. Wagner*, 2021-Ohio-1671, ¶ 12 (2d Dist.), quoting *State v. Nichols*, 2005-Ohio-1771, ¶ 11 (5th Dist.). Speedy-trial time may be extended by the circumstances listed under R.C. 2945.72(A) through (J).

{¶ 87} Under R.C. 2945.72(H), speedy-trial time is tolled for: "The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(H). "Continuances that a defendant requests toll the clock under R.C. 2945.7[2](H)[.]" *State v. Lewis*, 2021-Ohio-1895, ¶ 35 (2d Dist.). Likewise, "[a] continuance granted upon the parties' joint motion tolls time under R.C. 2945.72(H) because the motion is made, in part, by the defendant. Joint motions for a continuance toll a defendant's speedy-trial time because they can be attributed to both parties." *State v. White*, 2024-Ohio-2426, ¶ 35 (1st Dist.); *accord State v. Nelson*, 2024-Ohio-5750, ¶ 47 (12th Dist.); *State v. Dillon*, 2006-Ohio-3312, ¶ 35 (10th Dist.); *State v. Brown*, 2005-Ohio-2939, ¶ 44 (7th Dist.); *State v. Austin*, 2019-Ohio-686, ¶ 47 (5th Dist.); *State v. Nelson*, 2025-Ohio-2025, ¶ 34 (2d Dist.) ("A joint motion to continue falls under R.C. 2945.72(H), which extends the speedy trial time for the period of any continuance on the accused's own motion.").

{¶ 88} Under R.C. 2945.72(E), speedy-trial time is also tolled for: "Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E). To qualify as a tolling event under R.C. 2945.72(E), "all that the statute requires is that the delay be necessitated by the defendant's action." *State v. Belville*, 2022-Ohio-3879, ¶ 31. "Any period of delay necessitated by a defendant's own motion automatically acts as a tolling event." *State v. Whitfield*, 2023-Ohio-240, ¶ 29 (2d Dist.), citing *Belville* at ¶ 31.

{¶ 89} It is well established that a motion to suppress tolls speedy-trial time pursuant to R.C. 2945.75(E) "for at least a reasonable time until the motion is heard." *State v. Lilly*, 1985 WL 17499, *3 (2d Dist. Nov. 19, 1985); *accord State v. Boyd*, 2023-Ohio-2079, ¶ 21 (2d Dist.); *State v. Wood*, 2024-Ohio-5597, ¶ 41 (2d Dist.) "There is no bright line rule with

28

respect to what constitutes a reasonable amount of time to render a decision on a motion to suppress." *Wood* at ¶ 41. "Rather, a reviewing court must carefully examine the record and consider the particular "'facts and circumstances of each case.'"" *Id*., quoting *State v. Taylor*, 1995 WL 680052, *12 (2d Dist. Nov. 17, 1995), quoting *State v. McDaniel*, 1995 WL 75394, *3 (4th Dist. Feb. 21, 1995).

{¶ 90} The record indicates that Hopkins was arrested on December 12, 2023, so his statutory speedy-trial time began running the following day on December 13, 2023. The record does not indicate that Hopkins was released on bond; accordingly, he had 90 days to be brought to trial. On February 2, 2024, after 51 speedy-trial days had elapsed, Hopkins filed a motion to suppress, tolling the statutory speedy trial time. The trial court held a hearing on the motion to suppress on March 4, 2024. Following the hearing, the trial court issued a written decision denying the motion on March 6, 2024, which was a reasonable amount of time. The speedy-trial clock then began to run after the decision.

{¶ 91} Fourteen days after the trial court issued its decision overruling Hopkins's motion to suppress, the trial court issued a scheduling order on March 20, 2024, indicating that the parties had agreed to hold trial on July 8, 2024. A week prior to that date, the court issued another entry stating that "by agreement of the parties, the July 8, 2024 jury trial is continued" and that "trial is now set for 9/23/24 . . . ." The trial then went forward as scheduled on September 23, 2024. These agreed continuances tolled the speedy-trial time pursuant to R.C. 2945.72(H). *See Nelson,* 2025-Ohio-2025 at ¶ 34. When considering all these tolling events, only 65 days of speedy-trial had elapsed before Hopkins was brought to trial, which was within the 90-day statutory limit. There was no basis for Hopkins's trial counsel to file a motion to dismiss on statutory speedy-trial grounds, meaning that counsel did not perform

29

deficiently by failing to file such a motion. Because there was no deficient performance on the part of counsel, Hopkins's ineffective assistance claim fails.

{¶ 92} Hopkins's ninth assignment of error is overruled.

**Tenth Assignment of Error**

{¶ 93} Under his tenth assignment of error, Hopkins claims that the trial court erred and abused its discretion by failing to grant his midtrial request for a continuance of the trial so that he could retain new counsel. We disagree.

{¶ 94} "The determination whether to grant a continuance is entrusted to the broad discretion of the trial court." *State v. Froman*, 2020-Ohio-4523, ¶ 91, citing *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. Therefore, "an appellate court may not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Sigurani*, 2025-Ohio-1573, ¶ 11 (2d Dist.). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 2013-Ohio-966, ¶ 34. "An abuse of discretion most often involves an unreasonable decision that is not supported by a sound reasoning process." *State v. McHenry*, 2021-Ohio-3118, ¶ 16 (2d Dist.), citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Darmond* at ¶ 34, citing *State v. Morris*, 2012-Ohio-2407, ¶ 14.

{¶ 95} In evaluating a motion for a continuance, "[s]everal factors can be considered: the length of the delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." *State v. Landrum*, 53 Ohio St.3d 107, 115 (1990), citing *Unger* at 67-68; *accord Froman* at ¶ 91.

30

{¶ 96} Hopkins claims that the trial court erred by denying him a trial continuance because it did not address any of these aforementioned factors. Hopkins, however, fails to cite any authority supporting the proposition that the trial court was required to give a talismanic recitation of the specific factors it considered when it denied his requested continuance. Upon review, we find that the trial court had no such obligation, and that the issue is simply whether the record establishes an abuse of discretion by the trial court.

{¶ 97} Hopkins requested a trial continuance for new counsel on the third day of trial after the State had already rested its case. The request stemmed from Hopkins's mistaken belief that his counsel had not requested a continuance based on the State's late disclosure of certain autopsy photographs. Hopkins expressed to the court his belief that his counsel had lied to him about requesting continuance and advised the court that he did not feel like he was being properly represented.

{¶ 98} The record shows that at the beginning of trial, Hopkins's counsel did in fact bring the late disclosure of the photographs to the court's attention. Hopkins's counsel and the trial court explained on the record that the court had indicated that it would rule on the matter later and that a continuance would not be granted. The record does not indicate that Hopkins had any other complaints or issues with his trial counsel.

{¶ 99} Under the circumstances of this case, we cannot say that it was unreasonable for the trial court to deny Hopkins a trial continuance. Continuing Hopkins's trial midway through for the purpose of allowing Hopkins to retain new counsel for an unfounded reason defies logic. The late timing of Hopkins's request and its unfounded reasoning suggest that Hopkins may have been disappointed with the strength of the State's evidence against him and was simply trying to delay the proceedings. Also, by the third day of trial, the trial court

31

had a prevailing interest in keeping the trial and docket moving. For all these reasons, we find that the trial court did not abuse its discretion by not continuing Hopkins's trial.

{¶ 100} Hopkins's tenth assignment of error is overruled.

**Eleventh Assignment of Error**

{¶ 101} Under his eleventh assignment of error, Hopkins claims that the trial court violated his Sixth Amendment right to counsel when it did not allow him to fire his retained counsel midway through trial and hire new counsel of his choice. We disagree.

{¶ 102} "Decisions relating to the substitution of counsel are within the sound discretion of the trial court." *State v. Jones*, 91 Ohio St.3d 335, 343 (2001), citing *Wheat v. United States*, 486 U.S. 153, 164 (1988). Therefore, "[t]he trial court's decision is reviewed under an abuse-of-discretion standard." *State v. Cowans*, 87 Ohio St.3d 68, 73 (1999); *accord State v. Murphy*, 91 Ohio St.3d 516, 523 (2001); *State v. McCoy*, 2010-Ohio-2639, ¶ 45 (2d Dist.).

{¶ 103} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const., Amend. VI. "An element of the constitutional right to counsel is the right of a defendant who does not require appointed counsel to choose who will represent him (or her)." *State v. Newby*, 2024-Ohio-1391, ¶ 41 (2d Dist.), citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).

{¶ 104} "'[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate . . . rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" *Jones* at 342, quoting *Wheat* at 159. "Thus, '[a] defendant has only a *presumptive* right to employ his own chosen counsel.'" (Emphasis

32

in original.) *Id.*, quoting *State v. Keenan*, 81 Ohio St.3d 133, 137 (1998). "Accordingly, while the right to counsel of one's choice is embedded in our jurisprudence, it is not without exceptions." *State v. Breneman*, 2012-Ohio-2534, ¶ 11 (2d Dist.), citing *Wheat* at 159.

**{¶ 105}** "Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include 'the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense.'" *Jones*, 91 Ohio St.3d at 342, quoting *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996). "'[M]ere hostility, tension, and personal conflicts between attorney and client do not constitute a total breakdown in communication if those problems do not interfere with the preparation and presentation of a defense.'" *State v. Coleman*, 2015-Ohio-5381, ¶ 11 (2d Dist.), quoting *State v. Coleman*, 2004-Ohio-1305, ¶ 25 (2d Dist.); *accord State v. Brock*, 2017-Ohio-759, ¶ 25 (2d Dist.).

**{¶ 106}** "In addition, courts should 'balanc[e] . . . the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.'" *Jones* at 342-343, quoting *Jennings* at 148. The United States Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." (Citations omitted.) *Gonzalez-Lopez*, 548 U.S. at 152. Moreover, the Court has recognized that trial courts have an "'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Id.*, quoting *Wheat* 486 U.S. at 160.

**{¶ 107}** As a further matter, courts ""'must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court.'"" *Breneman*, 2012-Ohio-2534,

33

at ¶ 13 (2d Dist.), quoting *State v. Harmon*, 2005-Ohio-1974, ¶ 32 (4th Dist.), quoting *U.S. v. Kryzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988). "We have previously found a suggestion of bad faith where motions to substitute counsel are made on the day of trial, particularly when the trial date has been set for some time." *Id.* at ¶ 17, citing *McCoy*, 2010-Ohio-2639 at ¶ 48 (2d Dist.). "In such circumstances, there must be 'a strong showing of good cause to overcome the implication of bad faith resulting from the timing of the motion.'" *McCoy* at ¶ 48, quoting *State v. Satterwhite*, 2009-Ohio-6593, ¶ 42 (2d Dist.).

{¶ 108} In this case, the record does not reflect that the conflict between Hopkins and his counsel was "'so great that it resulted in a total lack of communication preventing an adequate defense.'" *Jones*, 91 Ohio St.3d at 342, quoting *Jennings*, 83 F.3d at 148. The conflict arose from Hopkins erroneously believing that his counsel had lied to him about discussing with the trial court the State's late disclosure of autopsy photographs and about counsel seeking a trial continuance on that basis. The record indicates that counsel had not lied to Hopkins about those matters and that Hopkins had no other specific complaint about his counsel's performance. We cannot say that Hopkins's misunderstanding about his counsel's actions resulted in a total breakdown of communication that would have interfered with the preparation and presentation of his defense.

{¶ 109} The timing of Hopkins's request to hire new counsel is also significant. Hopkins made the request on the third day of trial after the State had already rested its case. Such timing suggests that Hopkins may have been unhappy with the strength of the State's evidence against him and was simply trying to delay the proceedings. Hopkins made no strong showing of good cause to overcome that implication.

{¶ 110} Taking the foregoing circumstances into consideration, and balancing Hopkins's right to be represented by the counsel of his choice against the interests of the

public in the prompt and efficient administration of justice, we find that the trial court did not abuse its discretion by denying Hopkins's request to hire new counsel midway through trial.

{¶ 111} Hopkins's eleventh assignment of error is overruled.

## Conclusion

{¶ 112} Having overruled all of Hopkins's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.